## LOONEY v. COUNTY ELECTION BOARD (CRUMP, Intervenor).

No. 21789. Opinion Filed Oct. 18, 1930.

Rehearing Denied Dec. 16, 1930.

Irvin L. Wilson, C. Guy Cutlip, and V. R. Biggers, for petitioner.

B. B. Blakeney and A. S. Wells, for respondents and intervener.

MAXEY, Special Justice. This is the third prohibition proceeding from Seminole county instituted in this court by the petitioner, Joseph C. Looney, and growing out of the primary election held on July 29, 1930, wherein the petitioner and George C. Crump, the intervener herein, were candidates for nomination by the Democratic party as district judge for the Ninth judicial district of this state.

In the first proceeding, entitled Looney v. County Election Board of Seminole Couney et al., No. 21575, 145 Okla. 25, 291 Pac. 554, this court issued a writ of prohibition to the county election board of Seminole county, prohibiting it from recounting any of the ballots cast at the primary election in that county for the office of district judge of the Ninth judicial district until such time as it was made to appear to the board, from evidence, that the ballots sought to be recounted "had been preserved in the manner and by the officers prescribed by the statute, and that they were the identical ballots cast by the voters and that while in said custody they had not been so exposed to the reach of unauthorized persons as to afford a reasonable opportunity of their having been changed or tampered with."

After the issuance of this writ, the county election board of Seminole county convened and heard the testimony of many witnesses, most of whom were precinct election officials and members of the county election board of said county. At the conclusion of this hearing, the county election board made its determination as follows:

"This board, pursuant to an opinion of the Supreme Court No. 21575, has heard the testimony produced by the contestant in the above styled and numbered action. This testimony has been taken in shorthand by a reporter designated by this board. We have also heard the testimony of one witness Ira J. Banta, called by the contestee.

"Thereupon both contestant and contestee rested their cases, in so far as the evidence was concerned, with the reservation on the part of the contestee that in the event the county election board should decide to open the boxes for the purpose of counting the ballots, the contestee might have the right of objection to any condition in which the boxes might be found.

"We have listened to the testimony of all the witnesses relative to the manner in which these ballots have been preserved and the method in which the boxes have been guarded from the time the votes were cast until the present moment.

"We are, therefore, of the opinion that the ballots challenged in the petition of the contestant have not been disturbed, tampered with or altered since the time they were cast by the voters; and we are of the opinion that the ballots now sought to be recounted are the identical ballots cast at the primary election July 20, 1930.

"We are further of the opinion that the petition of the contestant is sufficient to justify a recount of the ballots, save and except precinct known and designated only in the prayer of the petition 'as Wolf,' and that no definite error or detailed statement challenging the correctness of the vote in this precinct has been set forth by the contestant in his petition. We are, therefore, of the opinion that no recount should be allowed of the box known as precinct 'Wolfe Three.'

"It is, therefore, the order of the county election board that in conformity of this opinion that all boxes prayed for in the petition, save and except 'Wolfe Three,' be opened for the purpose of recounting the same in this contest."

One of the members of the county election board dissented therefrom.

After that determination was made, the election board proceeded to count certain ballots cast for the Democratic nomination for district judge. However, before the board had made any change in the tabulation of the vote cast or had certified the same for the office of district judge to the State Election Board, the petitioner commenced a second proceeding in this court, which is entitled Looney v. County Election Board of Seminole County et al., No. 21727, 145 Okla. 136, 292 Pac. 44.

In this last mentioned case this court held that the county election board had acted in violation of the writ of prohibition issued in the former case, in that its findings did not conform to the demands of the writ requiring "that the ballots had been pre-

served in the manner and by the officers prescribed by the statute and that they were the identical ballots cast by the voters and that while in said custody they had not been so exposed to the reach of unauthorized persons as to afford a reasonable opportunity of their having been changed or tampered with," and, in the absence of such findings, the board was without authority to recount the ballots. This second writ prohibited the county election board from making any change in the official returns of the several precincts in Seminole county for the office of district judge in the general primary election, held on July 29, 1930, and from recounting the ballots cast at said election until the finding and determination required by this court in its writ of prohibition in cause No. 21575 had been made.

After the issuance of this writ, the county election board again convened on October 3, 1930, and proceeded to hear evidence and make another finding. At this last hearing all the testimony which had been taken in the former hearing was introduced and certain additional testimony heard. At the conclusion of this hearing a majority of the election board made the following findings and conclusions, to wit:

"Now, on this 3rd day of October, 1930, the county election board of Seminole county, Okla. being duly assembled for the purpose of taking further and additional testimony upon the petition of George C. Crump, contestant herein, and he being present in person and by his attorneys, and Joseph C. Looney, contestee, being present in person and by his attorneys, this board finds:

"First: That pursuant to the petition filed by the contestant, and a writ of prohibition issued by the Supreme Court of Oklahoma, in cause No. 21575 in said court, this board has heretofore sworn and examined and taken the testimony of numerous witnesses, and pursuant to a writ of prohibition issued out of the Supreme Court in cause No. 21727, this board has now reassembled for the purpose of taking further testimony and witnesses have been sworn and examined and the parties to this action have closed, and this board now considers all of the testimony so introduced at this and at former hearings and finds:

"First. That the ballots in the following precinct boxes, to wit: Brown township, precinct boxes 1, 2, 5, 6, and 7; Econtuchka township, precinct boxes, 1, 4, 5, 10, 11, and 12; Miller township, precinct boxes 1 and 2; Wolfe township, precinct boxes 2, 4, 5, and 7; Redmond township, precinct boxes 4 and 5. have since the 29th day of July, 1930, up to and including this date, been preserved in the manner prescribed by the statute.

"Second. That the ballots have been preserved by the officers prescribed by the statute.

"Third. That the aforesaid precinct boxes now contain the identical ballots cast by the voters at said election.

"Fourth. That the ballots in the aforesaid precinct boxes while in the custody of the officers prescribed by the statute have not been so exposed to the reach of unauthorized persons as to afford a reasonable opportunity of their having been changed or tampered with.

"Fifth. That the ballots in the aforesaid precinct boxes should be by this board recounted.

"It is, therefore, ordered that the ballots in the following precinct boxes, to wit: Brown township, precinct boxes 1, 2, 5, 6, and 7; Econtuchka township, precinct boxes 1, 4, 5, 10, 11, and 12; Miller township, precinct boxes 2, 4, 5, and 7, Redmond township, precinct boxes 4 and 5, be by this board recounted and tabulated pursuant to the allegations of contestant's petition, and the evidence taken and considered by this board and these written findings."

To these findings and conclusions one of the members of the board dissented. A recount of the ballots contained in the precinct boxes, referred to by the board in its findings, when taken in connection with the posted returns from Hughes county, the other county in the nominating district, and also the posted returns from the other precincts in Seminole county, showed that George C. Crump received the majority of the votes cast at said election. The county election board, however, did not make any change in the tabulation of the vote cast for this office from that contained in the tabulation of the returns by the precinct officers, nor did it certify the votes cast for the office of district judge to the State Election Board. The petitioner thereupon filed this proceeding, wherein it is sought to prohibit the election board from performing these acts.

It will be noticed that the last findings and conclusions of the county election board of Seminole county are in strict conformity with the requirements of the writ of prohibition issued by this court in cause No. 21727, supra, but the petitioner contends that there is no evidence in the record to sustain such findings and that, therefore, the action of the board in making such conclusions and recounting the ballots thereunder and tabulating and certifying the returns of such recount is an attempt on behalf of said board to make an excessive and unauthorized application of judicial force in a cause properly cognizable by it

and that this court should, therefore, issue a writ of prohibition as prayed.

This recount is attempted under the provisions of section 6 of an Act approved July 12, 1929, commonly known as the Run-Off Primary Law (chapter 241, Sess. Laws 1929). This section, after providing the manner in which a candidate may challenge the correctness of announced and posted results by filing a verified petition with the county election board, setting forth certain facts, and after providing the manner of the hearing before said board and giving to the secretary thereof the authority to issue subpoenaes for the witnesses to be served by the sheriff or his deputy, further provides as follows:

"No continuance shall ever be granted for such hearing for any purpose and no appeal to or review by the court shall ever be taken or had from any final decision of the proper board governing any regular primary election."

It is evident that it was the intention of the Legislature to make the findings and conclusions of the county election board in this character of case final. This was no doubt thought to be necessary in order to make the provisions of the Run-Off Primary Law effective and workable. Under this act, the first primary is to be held on the last Tuesday in the month of July, and if, for any specific office, no candidate receives a majority of the votes cast at this first primary, then the two highest are placed on the ballot for a second primary, which is to be held on the second Tuesday of the month of August of the same year. It will be observed that there is only a period of two weeks between the first and second primaries and, in order that all controversies might be settled in time to have the ballots prepared for the run-off primary, the Legislature attempted to keep these contests out of the courts and to let them be settled by the county election boards of the various counties.

The Legislature cannot deprive this court of its right of superintending control over inferior courts, commissions, and boards which are exercising judicial or quasi judicial authority as granted by section 2, art. 7, of the Constitution of this state; but this superintending control is exercised, not by appeal, nor proceedings in the nature thereof, but by the issuance of remedial writs, named in the Constitution, and such others as may be provided by law. Prohibition is one of these writs and had often been resorted to by this court under the provision of the Constitution above referred to.

Prohibition is not a writ of right, but one of sound discretion, to be granted or withheld by the courts exercising supervisory control according to the nature and circumstance of each particular case. Hall v. Barrett, 121 Okla. 122, 247 Pac. 972; Jones v. Pugh, District Judge, 130 Okla. 291, 267 Pac. 272.

The court, when called upon to exercise its discretion on application for writ of prohibition, must take into consideration the established policies of the other co-ordinate branches of the government and give effect to them, unless, by so doing, manifest injustice would result.

In the examination of the evidence which was before the county election board, this court is restricted to determining whether or not there was any evidence to sustain the findings and determination, as said by us in cause No. 21727, supra, as follows:

"Had the finding and determination required by the writ of this court in cause No. 21575, supra, as a condition precedent to a recount of the ballots been made by the county election board, this court would review the record of the hearing before the county election board only so far as it was necessary to determine whether or not there was any evidence to sustain that finding and determination. If there was any evidence to sustain the finding and determination, it would be sustained. This court will not review such a record for the purpose of weighing the evidence, but where there is no evidence to sustain the finding and determination of the county election board, its finding and determination is but an arbitrary exercise of judicial power, and this court will exercise its supervisory power to prevent such an arbitrary exercise of judicial power by an inferior tribunal."

In ascertaining whether there is any evidence to support such findings and determination, the question is, admitting the truth of all the evidence of the contestant, together with such inferences and conclusions as may be reasonably drawn therefrom and eliminating all evidence of the contestee in conflict therewith and all opposing inferences, whether there is any competent evidence tending to support the same. Moses v. Harris, 111 Okla. 54, 237 Pac. 591; St. Louis & S. F. Ry. Co. v. Boush, 68 Okla. 301, 174 Pac. 1036; Chickasha Street Ry. Co. v. Wund, 37 Okla. 582, 132 Pac. 1078.

In examining the evidence, it is necessary for us first to determine whether or not section 6155, C. O. S. 1921, which provides for the preparation of the returns, custody of ballot boxes and contents, is mandatory or directory. It is conceded by all parties to this

proceeding that this section was not literally complied with, and, if a literal compliance is required, there would undoubtedly be no competent evidence in the record to support the findings and determination of the board. The evidence shows that in some of the precincts the ballots were placed loosely in the box, which was then locked and delivered to the secretary of the election board; in others, the ballots were placed on a string, which was tied and then put in the envelope, but no seal was placed on the knot, nor did the proper precinct officers write their names across the envelope. In others it appears that the ballots were strung, but not tied, and in some of them the ballots were placed in an envelope, the gummed flaps sealed, but no seal of sealing wax was placed upon the gummed flaps.

From an examination of the evidence, we do not believe that there was a strict, literal compliance with this statute in any precinct involved.

This court in the case of Newhouse v. Alexander, 27 Okla. 46, 110 Pac. 1121, held that the provisions of a similar statute, which was in force at that time, were not mandatory, but merely directory. The third paragraph of the syllabus in that case is as follows:

"That part of Sess. Laws Okla. 1905, c. 17, art. 1, sec. 8, which provides that 'all of the ballots counted and one certificate, one poll book and one tally sheet shall be securely sealed in a stout paper or muslin envelope or bag' is not mandatory, and when the ballots at the close of the count were placed in a large paper envelope, and the envelope was not sealed with the names of the election judges written across the seal, but was folded over at the end and sewed through with a needle and twine string anl the envelope containing the ballots was placed in the box and locked, and the ballots produced in court were the identical ballots voted by the voters of the precinct in question, and in the identical condition that they were when placed in the envelope by the election officers of the precinct, held, that the court did not err in admitting the same in evidence to rebut the presumption of the correctness of the official returns."

This also appears to be the rule adopted in most of the other states of the Union. Averyt v. Williams (Ariz.) 76 Pac. 463; Schneider v. Bray (Nev.) 36 Pac. 326; Hudson v. Soloman, 19 Kan. 177.

This was also the effect of the decision of this court in the case of Moss v. Hunt, 40 Okla. 20, 135 Pac. 282. It appeared in that case that, as to precinct five (5) in Wagoner county, the plaintiff in error offered evidence which tended to show that the counters at about 12 o'clock on the day of the election were requested by the precinct inspector to sign tally sheets and to execute the certificate of returns in the back of the book of ballots before the ballots had been counted; and that while the counters objected to this procedure, nevertheless upon the insistence of the inspector, they complied with his request. When the canvassing of the votes had been completed by the counters, and before the total vote had been made out upon such tally sheets by the counters, the tally sheets were gathered up by the inspector, and thereafter the certificate of returns in the back of the ballot book was made out by him without the assistance or support of the official counters, or without their knowledge of its contents. The inspector took the box containing the ballots and after some days delivered it to the county election board. The certificate of returns having been impeached, the court permitted the ballots to be offered in evidence, and the count showed that the defendant received fifty (50) votes and the plaintiff thirty-four (34). Thereupon, the plaintiff offered testimony by the judge of the election and also by certain bystanders that the number of votes received by the plaintiff was thirty-seven (37) instead of thirty-four (34), and the number received by the defendant was thirty-nine (39) instead of fifty (50). Some of the witnesses testified that the inspector after the votes had been counted made a memorandum for them or gave them a statement showing the number of votes received by each of the parties, and that such statement showed that the plaintiff received thirty-seven (37) votes and the defendant thirty-nine (39). The ballots were not placed in an envelope by the counters as required by statute; they were not sealed upon a string and no envelope was ever sealed by the counters; no waxed seal was placed upon the envelope nor were the names of the election officers indorsed thereon. There was evidence which tended to show that the ballot box had been opened by the inspector after it was first closed and locked by him. Only one tally sheet was returned by the inspector to the county election board, which was the tally sheet kept by the counter of the same political party. The other tally sheet was gone and could not be accounted for. The tally sheet preserved bore evidence of having been altered by the number written first opposite the name of the plaintiff having been scratched out and a smaller number written therein. The inspector who made the alteration attempted to explain it and testified that the ballots contained in the box were the identical

ballots and in the same condition as when cast by the voters.

Under this state of the record, this court held that the ballots had lost their character as controlling evidence, but that under such circumstances they were some evidence and might be counted and considered; and that it was a question of fact for the jury, or the court sitting as a trier of the facts, to determine what weight should be given to them. Speaking of this question, the court says:

"We think, under the circumstances, they may be considered; but it is a question of fact for the jury or the court sitting as a trier of the facts to determine whether they are the identical ballots cast by the voters of this precinct, and to determine whether the greater weight shall be given to the ballots or the evidence of the election judges and the bystanders, who testified as to the result either as ascertained by them from the talley sheets, or as stated by the election inspector at the close of the canvass."

After the case was reversed, it was again tried. These ballots were admitted in evidence, and the trial court found therefrom and from all the other evidence in the case that the defendant received fifty-two (52) votes and the plaintiff thirty-six (36), and declared Hunt to have been elected county judge of Wagoner county.

From this decision, an appeal was prosecuted to this court and is reported as Moss v. Hunt, 47 Okla. 1, 145 Pac. 760. This court in affirming the judgment, in the first and second paragraphs of the syllabus, states its conclusions as follows:

"In a contest proceeding involving the legality of certain votes cast in precinct 5 in Wagoner county, evidence was introduced showing such disregard of the law and irregularity by the election officials in making and signing the certificate of returns as to warrant the court in permitting the ballots introduced in evidence. Held, there were sufficient facts and circumstances tending to identify the ballots in question to warrant the court in permitting the same introduced in evidence for the purpose of counting.

"In a contest proceeding over the office of county judge of Wagoner county, it was contended by plaintiff that at the general election of 1913 the total vote cast at said election in precinct 5 for all candidates for said office was 88; that he received 37 and defendant received 39, and the Socialist candidate 11 votes: that there was one mutilated ballot. Plaintiff's evidence strongly tends to sustain his contention. Defendant contended there were 98 votes cast; that

he received 52, plaintiff 36, and the Socialist 10. The ballots were introduced in evidence, and after a recount thereof, in connection with the examination of the ballot stubs, the court found defendant's contention to be true. Held, there was sufficient evidence reasonably tending to sustain the findings of the court, and its judgment will not be reversed on appeal."

In view of these decisions, we hold that the provisions of the statute above referred to are directory and not mandatory; and that a substantial compliance therewith is sufficient (other necessary facts appearing) to entitle the boxes to be opened and the ballots recounted in a contest proceeding provided for by the Run-Off Primary Law.

It would unnecessarily burden this opinion to attempt to set out the substance of the testimony given by the various witnesses. Suffice it is to say that the precinct inspector in each precinct except one was put upon the witness stand. In one precinct it appears that the inspector was unavailable and the judge was called in his stead; also, in several instances, the counters from various precincts were interrogated. In each instance, these precinct officials testified that the ballots cast at the election were placed in the box, some in envelopes and some not; some were strung and some were not; gummed flaps on some of the envelopes moistened and pressed down, on others this was not done; but that the identical ballots cast by the voters were in some manner placed in the box and that box delivered to the secretary of the election board; and that the ballots contained therein were the identical ballots cast by the voters. The members of the county election board, the county clerk, and the watcher employed by the county clerk testified that in their best judgment the ballots were in the same condition as they were in when delivered by the precinct officials except as to four boxes which will be referred to hereinafter.

This evidence is to considerable extent unsatisfactory, and, if this court were the trier of the facts, it might reach a different conclusion than that reached by the county election board, but this is not the test.

The evidence also shows that, after the various boxes were delivered to the secretary of the county election board, he in turn delivered them to the county clerk; and the county clerk, after discussing the matter with the secretary of the county election board, employed a guard to watch them. It appears that the boxes were stacked in the office of the county clerk; and that he and his force watched them during the day;

and that the watcher employed by him was guarding them at night. Also, each of the interested parties appears to have had guards day and night to watch the boxes. The officers of the election board are not provided with an office, and it is the custom of these officers to transact their business and keep the ballot boxes in the office of the county clerk, or some other county officer. If they fail to do this, then they would have to rent an office, take the boxes to their home, or provide some other place to keep them.

In view of the evidence last above referred to, it is contended by the petitioner that the ballots were not preserved by the officers as provided by law, and that there is no evidence to support the finding of the county election board to this effect.

The provisions of our laws requiring that ballots shall be preserved by the county election board are not mandatory, but directory merely. Newhouse v. Alexander, supra.

In the above-entitled case, this court in the second paragraph of the syllabus makes the following observation:

"That part of Sess. Laws Okla. 1905, c. 17, art. 1, sec. 8, which provides that 'said ballot package shall be preserved by the county clerks in some secure and safe place,' is not mandatory. Where the ballots are preserved so that their identity is assured, they can be counted during a contest; and they are undoubtedly better evidence of the vote cast than the returns, and should prevail where there is a difference. But, before a recount of the ballots should be allowed to rebut the presumption of the correctness of the official returns, it should be proved satisfactorily that the ballots have not been tampered with since the election, and that those offered in evidence are the identical ones cast."

By reason of the rule heretofore adopted by this court that these sections are not mandatory, but merely directory, we cannot, from an examination of the evidence, say that the findings of the board were wholly unsupported thereby. We cannot adopt the view that the members of the election board must personally remain with the boxes at all times. Their possession may be constructive as well as actual, provided that they in good faith attempt to preserve the integrity of the ballots; and these questions are for the determination of the county election board.

It is, however, objected that, after the board had made its findings and opened the boxes to recount, it appeared that some of them were not in condition as testified by the precinct officer; that, in some instances, where such officers have testified that the ballots had been put in an envelope, and the envelope sealed, when the box was opened it was found that the envelope was not sealed, and in one or two instances where the precinct officers had testified that the ballots were put on a string, when the box was opened this condition did not appear; and, for that reason, the ballots in those boxes should have been rejected as having no probative value, or, if any, not enough to overcome the prima facie results shown by the returns made by the precinct officers. There is no doubt but that this condition did affect the probative value of the ballots found in these boxes; but, as said by this court, in Moss v. Hunt, 40 Okla. 20, such ballots may be considered, and it is a question of fact for the trier of the facts to determine whether they are the identical ballots cast by the voters, and to determine whether the greater weight should be given to them or the returns.

Again, we say that had we been the trier of the facts, we might have reached a different conclusion, but in this proceeding our inquiry is limited to whether or not there is any evidence to support the conclusions of the election board; and, in doing this, we must admit the truth of all the evidence offered by the contestant, together with such inference and conclusions as may be reasonably drawn therefrom, and eliminate all of the evidence of the contestee and all opposing inferences. Measured by this rule, we cannot say that there is no evidence to support the conclusion of the board in this behalf.

It appears that in the beginning of this contest the county election board, believing that it was its duty to recount the ballots on the filing of verified petition, without hearing evidence, proceeded to count them in four boxes, at which time this court issued its first writ of prohibition, above referred to. It also appears that at this attempted recount there were present the members of the county election board, both the contestant and contestee, their respective attorneys and several of their partisans. The ballots were taken out of the boxes and counted by the election board and then passed around to the various parties in the room, possibly a dozen or more, and each person would examine the ballot and then pass it on to another. It appears that at one time during this proceeding the members of the county election board all left the room and the other persons left, with the exception of some of the attorneys of both the

214

contestant and the contestee, and in a few minutes thereafter the members of the county election board returned, put the ballots back in the boxes, locked them and discontinued the further counting thereof; but the evidence shows that at all times either the members of the county election board or the contestant and the contestee, or attorneys and representatives of both, were present. It is ably contended that, as to these particular boxes, the evidence is conclusive that the ballots therein were "so exposed to the reach of unauthorized persons as to afford a reasonable opportunity of their having been changed or tampered with" and that the conclusions of the board to the contrary are not supported by any evidence. The exposure of the ballots to the reach of unauthorized persons is not within itself sufficient to destroy their integrity, but, in addition to this, there must have been afforded "a reasonable opportunity of their having been changed or tampered with." The fact that they might possibly have been tampered with does not warrant their rejection. This question was fully discussed by the Supreme Court of Arizona in the case of Averyt v. Williams, supra, the conclusions of the court being stated in the syllabus as follows:

"Though the ballots were not strung or placed in a sealed envelope, and at once delivered to the county treasurer, as provided by statute, they are admissible, on a contest, to overcome the return of the election officers, contestant, however, having the burden of showing * * * that there is no reasonable probability that they have been disturbed or tampered with. The fact that they might possibly have been tampered with does not warrant their rejection."

Considering the bitterness and feeling which has been injected into this contest by both parties, we can hardly conceive how any of the partisans of either of them would have a reasonable opportunity to change or tamper with the ballots when partisans of the other were present and looking on. From the evidence about referred to, relating to these four precincts, we cannot say that findings and conclusions of the election board are wholly unsupported.

This court was organized primarily for the purpose of exercising appellate jurisdiction. The superintending control given to it by the provision of the Constitution, above referred to, is important and necessary and the court will not hesitate to exercise it in proper cases, but we do not feel that we should do this to such an extent that it would seriously affect the primary purpose for which the court was created. The court does not propose to become a super election board and thereby undertake to superintend the various elections held in the state. This does not mean that we would decline to interfere in any election case where proper showing is made, but we will only interfere where the election board is exceeding its jurisdiction, or where there is a gross abuse of judicial force.

It is impossible for this court to definitely say whether or not the ballots which have been recounted were the identical ones cast by the voters at the election. The members of the county election board saw the witnesses, heard their testimony, no doubt were personally acquainted with every one who testified, were more familiar with the transaction than we could possibly be and in a much better position to determine the truth in relation thereto. Members of the county election board are appointed by the duly constituted authorities of the state and we cannot presume that they will be derelict in their duty, nor unfaithful to their trust; in fact, we must indulge the opposite presumption. This presumption, of course, could be overcome by sufficient proof, but we do not believe it has been done in this case.

We have carefully read the record and are driven to the conclusion that the alternative writ should be quashed and this proceeding dismissed for two reasons:

(1) That there is some evidence in the record to support the findings and conclusions of the county election board.

(2) That, in view of the entire record, we do not feel that we would be justified in exercising our discretion to interfere with the findings and determination of the board in this particular case.

Alternative writ of prohibition quashed and cause dismissed.

MASON, C. J., and HEFNER and CULLISON, JJ., concur. ANDREWS, J., and PORTER, Special Justice, concur in the conclusion. CLARK and SWINDALL, JJ., dissent.

RILEY, J., absent.

LESTER, V. C. J., and HUNT, J., disqualified: Hon. GEORGE M. PORTER, of McAlester, and Hon. J. HARVE MAXEY, of Tulsa, duly appointed as Special Justices.

CLARK, J. (dissenting). I regret that I am forced to disagree with the law as announced in the opinion of the court in this case. Standing between the respect I have

for the ability and integrity of my associates on the one hand, and the duty I owe the citizenship of Oklahoma on the other, I must follow the guide of my conscience and in my feeble way point, if I can, to the light that shines along the pathway of right and justice.

The administration of justice is a practical affair, an invention for the adjustment of the rights of individuals, and is not a technical and accurate science, but an applied science, adjusting itself to work out justice in all the protean shapes the dealings of mankind assume.

In the case at bar an election was held in which two gentlemen, Joseph O. Looney and George C. Crump, were before the voters of Hughes and Seminole counties for the Democratic nomination for the office of district judge. It is an important office under our system of government. The election was held on July 29, 1930. The voters, exercising their rights as American citizens, went to the polls and cast their vote for the respective candidates. The precinct election officials in each and all precincts in the district counted and canvassed the returns in that contest and each made return to the county election board of the canvass of the votes for district judge as provided by law. When the total vote was canvassed by the county election board of the respective counties, it was found that Joseph O. Looney received the larger number of votes cast by the voters, exercising the privileges of American citizens of the two counties. Immediately thereafter, George C. Crump filed his application for a recount before the election boards of Hughes and Seminole counties.

Application for writ of prohibition was made to this court to prohibit the recount. The recount was prohibited in Hughes county on the ground that the petition did not state facts sufficient to give the election board of Hughes county jurisdiction. It is my opinion that the petition in Seminole county was as defective as the petition in Hughes county, and the writ should be applied alike to both counties. The writ issued to Seminole county directed that the board should before ordering a recount take testimony and determine that the ballots sought to be recounted had been preserved by the officers as required by law, and in the manner required by law; and that while in said custody they had not been so exposed to the reach of unauthorized persons as to afford a reasonable opportunity of their having been changed or tampered with.

After the application was made for the writ before this court, and before the writ could be served on the election board of Seminole county, George C. Crump caused the board to be assembled, and on August 4, 1930, proceeded with the recount.

One significant fact in this case that stands out, and is not explained or considered in the opinion by this court, is that George C. Crump, upon the beginning of this recount, selected four boxes that he desired recounted. He did not select them in the order named in his petition or in the order in which they were delivered to the election board. The four boxes selected were sufficient to change the result of the election. This is one spot on the record that has not been erased and stands as mute evidence of a stain.

The election board heard the testimony and ordered a recount of 19 boxes. The first order included 20 boxes, but the record disclosed that one night two men were found with the ballots of Wolf township, precinct No. 6, spread upon a desk, and were going through them. The board eliminated that box on the theory that it had been exposed to the reach of unauthorized persons, and so this one rotten spot was eliminated from this case.

This court in cause No. 21727, Looney v. County Election Board of Seminole County et al., 145 Okla. 136, 292 Pac. 44, at page 6 of the opinion, said:

"Had the finding and determination required by the writ of this court in cause No. 21575, supra, as a condition precedent to a recount of the ballots, been made by the county election board, this court would review the record of the hearing before the county election board only so far as it was necessary to determine whether or not there was any evidence to sustain that finding and determination. If there was any evidence to sustain the finding and determination, it would be sustained. This court will not review such a record for the purpose of weighing the evidence, but where there is no evidence to sustain the finding and determination of the county election board, its finding and determination is but an arbitrary exercise of judicial power and this court will exercise its supervisory power * * * by an inferior tribunal."

The question before us in the instant case is, Was there any evidence supporting the finding of the election board? The majority opinion holds that there was evidence sufficient to support the finding of the election board. I am of the opinion that an examination of the record would not disclose the testimony of a single witness or a single fact contained therein which tends to

establish the finding of the election board: (1) That the ballots had been preserved by the officers required by law. (2) While in said custody they had not been so exposed as to afford a reasonable opportunity of their having been changed or tampered with. No evidence is quoted in the majority opinion.

There is one thing peculiar in this western country. Travelers upon the plains see a mirage, and upon closer examination of what was believed to be a beautiful lake of pure, clear water develops to be the sandy desert of the staked plains. A close examination of the record here would have shown that there is no evidence to sustain this finding. The record did contain testimony—testimony of probative force—testimony as to the condition and manner in which the ballots were handled, but no testimony sustaining the finding of the county election board. It was testimony that refutes the finding of the county election board. It is such testimony that shows that such finding was not founded on fact.

It is a reasonable requirement of the law that ballots should not be exposed to unauthorized persons that their sanctity and purity may be kept. The law in Oklahoma makes the precinct returns prima facie evidence of the result of an election. To overcome this return, before recount could be had, the burden is on the contestant to prove with a degree of certainty that the ballots had been so preserved as required by law, and that they have not been so exposed as to afford a reasonable opportunity of their having been changed or tampered with. The petitioner did not meet this burden and should not be granted a recount.

The ballots were first delivered to the county election board, then to the county clerk, who was unauthorized to have charge of them, and then to one Ray Kessee, who was without authority to have charge and custody of the boxes containing the ballots. On August 4, 1930, they were moved to the district courtroom, and there were in charge of various, divers, and sundry persons, none of whom were authorized under the law to have custody of the ballots. I do not know who did it, when nor why, but I do know from the record in this case that while in said custody the ballots were actually changed and tampered with, and the finding of the election board that they had not been changed or tampered with is not supported by any evidence, and is contrary to all evidence.

Wolf township, precinct No. 6, was elim-inated from the recount by the election board because two men were caught going through the ballots—two of the supposed custodians —two of the men this opinion points out would not have an opportunity to tamper with the ballots. This is explained by the fact that the ballots were left out of the box. They were also in an unsealed envelope, but after these two men got through with them, they put them back in the envelope and sealed it, and it was several days before the election board knew of this.

There is no proof that there were not other ballots left out of the box. There is no proof that other boxes were not gone into in the same manner that this box was handled. I am at a loss to understand how it could be found and determined by any court or board that there was no reasonable opportunity to tamper with the ballots. The law provides, section 6155, C. O. S. 1921, that the counters shall string the ballots, tie the string, and seal the knot; that they shall, thereafter, place same in an envelope with a gummed flap and seal the flap down; that the judge and clerk shall sign their names across the flap, and they shall not be opened, except upon order of the court or some legal proceeding. This requirement of the statute was done to protect and preserve the integrity of the ballot. The construction placed on this requirement by the majority opinion effectively destroys it. In fact, it is a judicial repeal of a salutary statute, enacted to prevent fraud and corruption in office. It further provides that when the boxes are delivered to the county election board the board shall take out the returns; shall not disturb the ballots; shall lock the boxes, and they shall be kept in the custody of the secretary of the county election board.

The majority opinion holds that this is not necessary to preserve the integrity of the ballot. It is a judicial repeal of a statute enacted to prevent fraud and corruption. The Legislature can enact salutary laws that protect the rights of the citizen and throw around him the protection of his right of self-government, and it is the duty of the courts to enforce said laws, to give them that construction that would prevent the fraud and corruption that the Legislature sought to prevent.

An election is the machinery whereby self-governing people may express their opinion in concrete form upon matters of public concern, and elect those to whom shall be intrusted the duty of administering public affairs of the body politic. If the

people are to be self-governing, it is essential that an election shall accurately register the public will, and if the officers chosen are not the real choice of the people, then those who have produced that condition will be masters, and the people will no longer be self-governing, and when the will of the people is thwarted by designing persons, and one has been declared elected to an office, when in fact such a one is not the public choice, then the machinery of government has failed in a most important particular.

Ours is a government which rests upon the will of the governed. It must be that there shall be no taint or suspicion attached to the machinery by which the will of the people is registered and expressed. The right of the ballot is a sacred right, and after the people have cast their vote for public officials, the vote has been canvassed and counted by public officials, sworn to do their duty, then to permit that result to be changed by a recount after the ballots have been tampered with, as the record in this case discloses, destroys the very foundation of our government.

Not a box offered in evidence before the county election board was preserved as required by law. Not a box was retained in the custody of the officials whose duty it was to retain custody of them. It is a well-settled rule of law that physical facts as to the condition of any particular thing overcome all other testimony.

It was agreed that in Brown township, precinct No. 1, the Democratic state ballots were not strung, tied, sealed, or contained in an envelope when the box was opened. There had been no attempt to comply with the law in regard to the manner in which the ballots should be preserved.

In Brown township, precinct No. 2, it was agreed that all state voted ballots were on top when the box was opened, and they were not strung on a string or contained in an envelope. They did not have the name of any election official or counter thereon.

In Brown township, precinct No. 5, the inspector testified that the ballots were in an envelope, which was sealed, and that the judge and clerk signed their names across the envelope. When the box was opened physical facts showed that the ballots were in an envelope, were not strung on a string, tied or sealed in any manner, and the envelope was only partially sealed.

In Brown township, precinct No. 6, the evidence showed that when the box, containing the ballots, left the precinct officials the ballots had been strung on a string, put in an envelope, and sealed by pasting the flap down on the envelope. When the box was opened the ballots were found in an envelope closed by a steel clasp, and the state ballots were on a string which was tied, but not sealed with wax.

In Econtuchka township, precinct No. 12, the testimony shows that the ballots were strung by the counters, tied, and placed in an envelope which bursted. When the box was opened the ballots were found in an envelope, were not strung or tied, but were loose in the envelope.

In Miller township, precinct No. 1, the precinct officials testified that the ballots were strung, placed in an envelope, and the gummed flap was pasted down and wax placed on it. When the box was opened the ballots were found in an envelope fastened with a steel clasp. The ballots were loose in the envelope. They had been strung, but the string was broken and not tied.

In Wolf township, precinct No. 2, the inspector testified that the ballots were strung on a string, the string tied, but he could not find an envelope to put the ballots into. When the box was opened the ballots were found in an envelope fastened with a steel clasp. The ballots appeared to have been strung, but the string was broken and about half of the ballots were off the string.

In Wolf township, precinct No. 5, the precinct inspector testified that after the ballots were tied and sealed with wax, they put them into an envelope and sealed the flap. When the box was opened the ballots were not in the envelope.

This is a fair summary of the evidence in the record, which is adjudged by the majority opinion as sufficient to sustain the finding that the ballots had not been so exposed to the reach of unauthorized persons as to afford them a reasonable opportunity of having been changed or tampered with. The law provides that the election officials shall furnish an envelope with a gummed flap thereon to be sealed. We must presume, and there is no evidence to the contrary, that this is the character of envelope furnished precinct election officials, and the evidence discloses that in the boxes in which apparently changes had been made a different kind of envelope was used to substitute for the regulation envelope, that is, one with a steel clasp, which was found to contain the ballots.

In one box, the election officials did not have an envelope, but did string the ballots. When the box was opened the ballots were

not on a string, but contained in an envelope fastened with a steel clasp. The burden of proof was on the contestant, George O. Crump, to prove that the ballots had not been tampered with. This burden was not met, and from the evidence in this case it is apparent that the ballots had been tampered with. As well require a solemn allegation that fish swim or that birds fly as to require allegations or proof that ballots, in the condition the ballots in question were, had been tampered with.

The majority opinion cites the case of Moss v. Hunt, 40 Okla. 20, as an authority for the holding therein. That case is distinguished from the case at bar. In the case at bar, the ballots were offered to overthrow the prima facie returns of the precinct officials. In the Moss Case the ballots were offered after the returns of the precinct officials had been impeached, and were only offered as secondary evidence. At page 23 of the Moss v. Hunt Case, supra, the court said:

"It is not the contention of plaintiff that their identity was destroyed by the conduct of the county election board, but by the acts of precinct election officers."

This clearly distinguishes that case from the case at bar. The tampering with and changing of the ballots is a fraud, and is rarely ever susceptible of positive proof, for the obvious reason that it does not cry aloud, in proclaiming its iniquitous purposes, from the house tops. Its vermiculations are chiefly traceable by covered tracks and studious concealments. Indeed, such a fraud is as illusive as the wind, of which it is said, "The wind bloweth where it listeth, and thou hearest the sound thereof, but canst not tell whence it cometh and whither it goeth." I believe the evidence offered in the instant case sufficient to uncover the fraud, strip aside the mask and let it stand in all its naked deformity exposed to the eyes of the world.

Tampering with election returns and thereby destroying the will of a free people and substituting the will of the midnight prowler is scarcely ever proven by admission, for it blows no trumpet. The result in this case is to strike down the will of the people expressed at the polls. Shall this court, which abhors fraud, delights to follow it relentlessly, high or low, and snatch away its fruits from its doors, which thereunto permits a wide and minute search for it, which is fond of declaring that it vitiates everything polluted by its dirty hands, supinely permit itself to stand baffled, help-less, puzzle-headed, and paralyzed before fraud in the ballot box? The assassins of the ballot might well smile when they awake to that view of it.

A man who steals his neighbor's cow, horse, or hog and carries the same away commits a serious offense, but he who steals his neighbor's right to self-government—he who fixes an election—commits a more serious crime, for the reason it strikes at the very foundation of our theory of government —that government can only exist by the consent of the governed. The corruption of the ballot box should never be permitted. Every honest mind hates it, and even those who practice it themselves will join in the denunciation of it.

The salutary statutes enacted to prevent fraud and corruption in elections, enacted to prevent the changing of an election after the vote was declared by the precinct officials, and enacted to keep the ballot pure and chaste and placed so that it could not be touched by the putrid hands of the fixer, should be so construed as to give effect to the intent of the Legislature. The administration of justice cannot be too often or too much quickened by recourse to salutary statutes intended to produce just, practical results.

Technical rules of construction announced by the majority opinion strike down all practical results. Rules are not the ultimate end, the main thing—that main thing is justice itself, and the very right of the matter. The rules are only in aid of that main thing—the working tools whereby it is attained.

It is obvious that the construction placed on the election law, permitting officials either by design or inadvertently to leave the ballots, contained in the boxes, exposed to unauthorized persons where the evidence shows that during such exposure they had been changed and tampered with, makes the law a gigantic trap to catch the unwary voter by the heel. The remedy provided by such a statute as construed is worse than a disease it was intended to cure in the body politic. Nay, the unclean spirit, ostensibly cast out, walking through dry places, seeking rest and finding none, would return with seven other spirits more wicked than himself, and finding rooms all swept and garnished would enter and dwell there, so that the last state of law would be worse than the first.

Posterity would think ill either of the candor or understanding of a court that

would hold the rights of the people may be so changed and destroyed, and that there is no remedy; that the ballots so kept, so disturbed, and so changed are not admissible to overcome the prima facie returns of the precinct officials. These are hornbook propositions, asserted by all text-writers, laid down by all courts, and worthy of all acceptance by intelligent men as of course, hence need no citation of authority to sustain them at this day.

I am of the opinion that the ballots kept as the undisputed proof shows are inadmissible to overthrow the will of the people, expressed at the ballot box, and as certified to by the precinct election officials. There was no proof offered of any fraud or mistake on the part of any precinct election officials, so we take it that no fraud was perpetrated and no mistake made; that being true, the only evidence that was offered to destroy the precinct election officials' returns is the ballots contained in the boxes, handled in a very unusual manner, each one showing that a substantial change had been made; that some mysterious force had taken ballots that were strung by the precinct officials on the string; that in some boxes envelopes with gummed flaps were taken and envelopes with steel clasps were substituted; that some mysterious force changed the condition of the ballots and the manner in which they were kept from the time they left the precinct officials' hands until they were opened and offered in evidence.

Enough specks make an apple rotten. I am of the opinion that there are enough specks, splotches, and stains in this record to destroy the evidential value of all the ballots offered in evidence. I am of the opinion the command thundered from Mt. Sinai many centuries ago, "Thou shalt not steal," should and does apply to elections.

The first opinion in this cause, Looney v. County Election Board of Seminole County et al., No. 21575, 145 Okla. 26, 291 Pac. 554, in which a writ of prohibition was issued, and at page 201 of said opinion, reads:

"It is, therefore, ordered that the county election board of Seminole county, Okla., and each and all of the members thereof, be, and they are, prohibited from recounting any of the ballots cast at the primary election * * * for the office of district judge until such time as it shall be made to appear to that board from evidence that the ballots sought to be recounted had been preserved in the manner and by the officers prescribed by the statute, and that they were the identical ballots cast by the voters, and that while in said custody they had not been so exposed to the reach of unauthorized persons as to afford a reasonable opportunity of their having been changed or tampered with. * * *"

This was a solemn judgment of this court, and was in a writ to the county election board of Seminole county. That same opinion also held that in taking evidence and determining whether or not the ballots would be admitted in evidence, the board was acting in a judicial capacity.

The holding in cause No. 21575, supra, was announced as the law in this state on September 9, 1930. Many election contests were at that time pending in the district courts of this state. Many of the same have been decided on the theory that the law as announced in that case would remain the law in this state. The law as announced in that case, while not specifically overruled in the majority opinion, is diametrically opposed to the views expressed in the majority opinion herein.

If many wise and good judges, each of them with an open mind seeking for truth and justice, each looking at the subject-matter from all sides and with one accord agreed on a given proposition, that proposition is no longer to be questioned, and agitation, discourse, and argumentation should come to an end. Is there not a strong presumption to be indulged in by seekers of truth that a conclusion is right which has been arrived at by the trained minds of many just men in possession of all the facts and in full light of possible reasoning?

So I believe the learned judges should follow the rule announced in cause No. 21575. The two opinions, No. 21575 and the majority opinion in the instant case, so promulgated by this court, as I see them, act the role in the childish play, "Now You See It and Now You Don't See It."

So in these latter days may I, with modest reverence, heed the prudent lines of Cardinal Newman's noble hymn:

"Lead, kindly Light, amid the encircling gloom,
Lead Thou me on;
I do not ask to see
The distant scene; one step enough for me."