The People of the State of New York ex rel. John H. Deister, Appellant, v. Thomas J. Wintermute, Appellant.

Elections — testimony of electors admissible to show how they voted at an election — voting machines.

An official canvass is only *prima facie* evidence of title to office and not conclusive. For the purpose of arriving at the will of the majority, the testimony of electors is admissible to show how they voted at an election.

The right of an elector to vote is conferred by the Constitution, and whenever he exercises that right in conformity with the methods prescribed by law, he is entitled to see that his vote is given full force and effect in the determination of what persons were elected to office.

While the use of a voting machine may make it more difficult to ascertain the true vote when the machine works defectively, than in cases where paper ballots are used and the ballots are preserved, the use of the machine does not necessarily impair the constitutional rights of the elector.

When the elector in the use of a voting machine complies with the prescribed regulations for its use so as to indicate his choice for any particular office, the vote, so far as he is concerned, is complete. The registry by the machine is simply a substitute for the canvass of written votes. That it failed to work properly cannot destroy the effect of the act of the elector in the exercise of his constitutional right.

Where it is not claimed that a voting machine recorded votes in excess of those cast, but that it failed to record votes which were cast, the record as returned by the machine should be taken as the starting point of the inquiry, and such record can be verified only by competent legal proof that voters did vote for their candidate to a number in excess of those registered by the machine.

Objections, if substantial, that the use of a voting machine violates the requirement of the Constitution, should be determined in a direct pro·

ceeding by mandamus, or otherwise, to compel the rejection of the machines and the use of the paper ballot, in which the subject can be fully investigated and the question fairly determined.

*People ex rel. Deister* v. *Wintermute,* 127 App. Div. 933, reversed.

(Argued November 30, 1908; decided January 5, 1909.)

CROSS-APPEALS from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered June 25, 1908, affirming a judgment entered upon a verdict directed by the court.

The nature of the action and the facts, so far as material, are stated in the opinion.

*William S. Jackson, Attorney-General* (*Michael Danaher* and *John J. Crowley* of counsel), for plaintiff, appellant and respondent.    In an action in quo warranto the certificate of election is only *prima facie* evidence of title and may be set aside.    (*People* v. *Ferguson,* 8 Cow. 102; *People* v. *Vail,* 20 Wend. 12; *People* v. *Seaman,* 5 Den. 409; *People* v. *Cook,* 8 N. Y. 67; *People* v. *Pease,* 27 N. Y. 45; *People* v. *Thacher,* 55 N. Y. 525; *People* v. *Livingston,* 79 N. Y. 279; *People* v. *Bell,* 119 N. Y. 175.)    The certificate of election having been set aside, the court may go behind the returns to ascertain the real facts and the actual vote, and the relator is entitled to prove by the best evidence available the actual vote cast for him for the office of county treasurer.    (*People* v. *Pease,* 27 N. Y. 45; *People* v. *Thatcher,* 7 Lans. 274; *People* v. *Livingston,* 79 N. Y. 279.)    The testimony of the voter showing for whom he voted for the office of county treasurer is the best evidence available.    (*People* v. *Pease,* 27 N. Y. 45; *People* v. *Thacher,* 55 N. Y. 525.)    The Constitution does not prohibit a voter from disclosing in an action in quo warranto how he voted. (*People* v. *McDonald,* 52 N. Y. Supp. 898; *Pearson* v. *Board,* 21 S. E. Rep. 483; *People* v. *Doe,* 109 App. Div. 670; *People* v. *Bell,* 119 N. Y. 175; *People* v. *Wood,* 148 N. Y. 142; *People* v. *Hockstine,* 76 App. Div. 25; *People* v. *Ferguson,* 8 Cow. 102.)    The Election Law does not prohibit a voter

from disclosing in an action in quo warranto how and for whom he voted. (Penal Code, §§ 41i, 41k, subds. 8, 12; L. 1896, ch. 909, § 104, subd. 2.) The court erred in holding that there was not a legal election to the office of county treasurer. (McCrary on Elections, §§ 190, 192, 488, 540; Paine on Elections, §§ 499, 513; *Attorney-General* v. *McQuade*, 94 Mich. 439; *Londoner* v. *People*, 15 Col. 557; *Chamberlain* v. *Wooden*, 23 Pac. Rep. 177; *Jones* v. *Glidewell*, 53 Ark. 161; *Blue* v. *Peter*, 40 Kan. 701; *Heyfron* v. *Mahoney*, 9 Mont. 497; *Vigil* v. *Garcia*, 87 Pac. Rep. 543; *Attorney-General* v. *Stillson*, 108 Mich. 419; *Attorney-General* v. *Kirby*, 120 Mich. 592; *Melvin's Case*, 68 Penn. St. 333; *City of Chicago* v. *People*, 80 Ill. 496; *Stafford* v. *Board of Canvassers*, 56 W. Va. 670; *Knowles* v. *Yates*, 31 Cal. 83.)

*Richard H. Thurston* for defendant, respondent and appellant. The court erred in admitting the testimony of the witness Biggs and the fifty additional witnesses from the first district of the fourth ward of the city of Elmira as to what they did in attempting to vote. (Cooley on Const. Lim. 912; *Dickson* v. *Orr*, 49 Ark. 238; *Sorrenson* v. *Sorrenson*, 189 Ill. 179; *Pedigo* v. *Grimes*, 113 Ind. 148; *Pennington* v. *Hare*, 60 Minn. 146; *Commonwealth* v. *Barry*, 98 Ky. 394; *Major* v. *Barker*, 99 Ky. 305; *Anderson* v. *Likens*, 104 Ky. 699; *People ex rel. Nichols* v. *Board of Canvassers*, 129 N. Y. 395; *N. Y. R. C. Co.* v. *Keator*, 62 App. Div. 577; *Montgomery* v. *Dorner*, 181 Mo. 5.) The loss or destruction of ballots in a particular district affords no ground for rejecting the return from that district, and furnishes no evidence to overthrow the certificate of election. (*Beardston* v. *Virginia*, 76 Ill. 35; *Ex parte Heath*, 3 Hill, 42; *People ex rel. Nichols* v. *Bd. of Canvassers*, 129 N. Y. 395; *West* v. *Ross*, 53 Mo. 350; *Pennington* v. *Hare*, 60 Minn. 146.)

Cullen, Ch. J. The action was brought to determine the title of the defendant to the office of county treasurer of Chemung county. At the general election held in 1906, the

**102**     People ex rel. Deister *v.* Wintermute.     [Jan.,

Opinion of the Court, per Cullen, Ch. J.     [Vol. 194.

relator and the defendant were candidates for that office, the term of the then incumbent of which expired on the 31st day of December ensuing. The defendant was the incumbent. The official canvassers awarded the office to the defendant by a plurality of two votes. The relator claimed the canvass was erroneous and that in truth he had received a plurality. On the trial of the action the following facts appeared: In the county of Chemung there were forty-five election districts, twenty-eight of which were in the city of Elmira. In that city were used at the general election of 1906 the U. S. Standard voting machines. Paper ballots were used in all the other districts outside of the city of Elmira with the exception of four. The controversy in the case has been caused by the failure of the machines to properly register the votes of the electors. The failure of the machines to operate correctly arose from the following circumstances: In the machines the candidates of the various parties are put in columns, one after the other, for the respective offices to be filled at the election. Candidates for the same office, of different parties, are placed in their respective party columns, but opposite each other on the same horizontal line. Opportunity is given to vote a "split" ticket by the use of a lever or knobs, and a device is employed which prevents the voter from voting for more than one candidate for the same office. Where, however, there are two or more vacancies in the same office to be filled the elector may wish to vote for candidates who are on the same horizontal line. To enable him to do so and also to prevent him from voting twice for the same candidate, instead of once for each of two candidates, another piece of mechanism is employed which is called an "indorsement bar." These bars are not part of the ordinary mechanism of the machine, but are used only in cases where there are two or more vacancies in the same office to be filled. There were two vacancies in the office of judge of the Supreme Court in the judicial district which includes the county of Chemung. In three of the Elmira districts the inspectors or other election officials, through ignorance, failed to properly adjust or fasten the indorse-

ment bars, the result of which was to affect the accurate working of the machine, not only with reference to the votes for the two offices named but throughout the whole ticket, so that it does not seem to have properly recorded or registered the votes of the candidates for any office. The failure was one of omission rather than of commission; that is to say, the machine did not record votes that were not cast, but it failed to record votes that were cast, and from a test of the operation of the machine made at the trial the failure to properly adjust the indorsement bars seems to have affected the Democratic column, in which the relator's name was, much more seriously than the Republican column, in which was the name of the defendant. This defect in the operation of the machine was fully explained at the trial, but the details it is unnecessary to relate. In the first district of the fourth ward the vote for the relator, as shown by the machine, was twenty-seven. On the trial the relator proved, by the testimony of fifty-one electors of that district, that they had voted for him at the election of 1906. Further testimony was given as to the failure of the machines to properly record the votes in two other districts. Testimony was also given on behalf of the defendant. At the conclusion of the evidence the relator asked that the question of who received the greater number of votes, he or the defendant, should be submitted to the jury for determination as a question of fact. The defendant asked that a verdict be directed in his favor that he was duly elected to the office. The trial court denied each request and held that on account of the failure of the voting machines to work there was no valid election for the office of county treasurer, but that the defendant was entitled to hold the office by virtue of his prior incumbency until his successor should be duly elected, and directed the jury to find a verdict to that effect. From the judgment entered on that verdict both parties appealed to the Appellate Division, where the judgment below was affirmed.

That an official canvass is only *prima facie* evidence of title to office and not conclusive may be said to be almost ele-

mentary law in this state (*People ex rel. Van Voast* v. *Van Slyck*, 4 Cow. 297; *People ex rel. Yates* v. *Ferguson*, 8 Cow. 102; *People ex rel. Benton* v. *Vail*, 20 Wend. 12; *People ex rel. Eastman* v. *Seaman*, 5 Denio, 409; *People* v. *Cook*, 8 N. Y. 67; *People ex rel. Smith* v. *Pease*, 27 N. Y. 45; *People ex rel. Stapleton* v. *Bell*, 119 N. Y. 175, p. 187), but in what manner and to what extent such canvass can be impeached presents the question argued before us. The first question, and that most elaborately argued by the learned counsel for the defendant, is as to the admissibility of the testimony of the electors to show how they voted at an election. He contends that to allow such testimony is to violate the secrecy of the ballot, and insists that the question is still an open one in this state. The claim that the question is an open one is clearly untenable It has long since been settled in this state by authority. The first Constitution of the state (1777) directed the legislature as soon as might be possible after the termination of the Revolutionary war to pass an act for holding all elections by ballot. (§ 6.) The Constitution of 1821 required all elections to be by ballot except for town officers. (Art. II, sec. 4.) The provision of that Constitution was re-enacted in the Constitution of 1846 (Art. II, § 5), and again in that of 1895, in which last, however, there is added. " or by such other method as may be prescribed by law, provided that secrecy in voting be preserved." That the object of this addition in the last Constitution was not to create any greater safeguards for the secrecy of the ballot than had hitherto prevailed, but solely to enable the substitution of voting machines, if found practicable, is too clear for discussion. Therefore, the older decisions of our courts have lost none of their authority by reason of any change in the Constitution. *People ex rel. Yates* v. *Ferguson* (8 Cow. 102) was quo warranto to try title to the office of clerk of Montgomery county. The relator's name was Henry F. Yates, and he was at times called Frey Yates. The canvassers refused the relator votes cast for H. F. or Frey Yates. On the trial of the action the circuit judge excluded the testimony of voters to the

effect that in voting for H. F. Yates or for Frey Yates they intended to vote for the relator. A verdict was rendered for the defendant, on which judgment was entered. That judgment was reversed by the Supreme Court, which held that the witnesses should have been allowed to testify. In that case no point seems to have been raised that the testimony would violate the secrecy of the ballot. Again in *People* v. *Cook* (8 N. Y. 68) testimony was admitted to prove that by votes for Benjamin C. Welch, Jr., or Benjamin Welch, the electors intended to vote for Benjamin Welch, Jr. Again the point that such evidence violated the secrecy of the ballot does not seem to have been raised. But in *People ex rel. Smith* v. *Pease* (27 N. Y. 45), despite a vigorous opinion by Chief Judge DENIO, which forcibly urged everything that could be said in support of that objection, the objection was overruled and the testimony held competent. It was sought to re-argue the question in *People ex rel. Judson* v. *Thacher* (55 N. Y. 525), but the court adhered to the doctrine of the *Pease* case, Judge ANDREWS saying: "The right to examine voters in an action in the nature of a *quo warranto* is in affirmance and vindication of the essential principle of the elective system, that the will of the majority of the qualified electors shall determine the right to an elective office." (P. 535.) It is true in the *Thacher* case this declaration was obiter, for the disposition of the case proceeded on another ground. Since the *Thacher* case, thirty-five years ago, the doctrine of the *Pease* case has never been questioned. It has been accepted as the settled law of the state, not only in quo warranto proceedings, but in criminal prosecutions against election officers, and such officers have been convicted and punished on the strength of such testimony. Nor can the *Pease* case be distinguished from the case at bar. True, in that case it was sought to show that persons who had voted for a certain candidate were not qualified electors, while here it is sought to show that the vote of the elector was not counted. But the purpose for which the testimony was offered has no bearing on the question of its admissibility,

since the only ground for excluding it is that it infringes on the secrecy of the ballot, an objection equally applicable to every purpose for which the testimony might be offered. We must, therefore, decline to treat the question as still open.

We are now brought to the consideration of the effect of this testimony if credited. If the voting had been by ballot there is no doubt that under the authorities cited the jury could have found that the relator was entitled to the votes of those witnesses, and if they were sufficient in number, to the office for which he was a candidate. It is contended, however, that a different rule is applicable to voting by a machine, and so the learned Appellate Division held on a previous appeal in this action (122 App. Div. 349, 352), where that court said : "In permitting the use of voting machines the statute has, in effect, provided that any elector who desires to vote for a candidate must register his choice by making a change in a counter, capable of being read by the inspectors, and which, by the understanding of all, expresses a vote for the candidate whose name is connected with the counter. It has made the question whether or not an elector has voted to depend upon a movement or change of the counter numbers. This is apparent from the character of the duty imposed upon the inspectors in canvassing the vote. They are only required to read, record and return 'the result as shown by the counter numbers.' They are not called upon to determine whether the voting machine did or did not work correctly, or to correct any error if one were made.

"The change or movement of the counter is the only means provided for expressing, carrying out or determining the choice of the voter, and as the very purpose of voting is to have it counted, it cannot be doubted that if a voter has not indicated his choice so that it can be determined, without intrinsic evidence of his intention, he has not voted, and it is a matter of no consequence whether the failure to express a preference is due to the condition of a ballot, the voluntary act of the voter, or to the defects in the mechanism or the operation of a voting machine." The learned court, there-

fore, concluded that the evidence would not establish that the
relator had received the votes of these witnesses; but, never-
theless, it held it was competent as showing that the electors
were deprived of the right to vote in sufficient number to
render the election illegal or ineffective. In this reasoning
we do not concur. The pith of it is that by the substitution
of machines for paper ballots the act of voting and that of
registering or canvassing the vote cast has been so blended as
to constitute a single indivisible thing, and that if a vote is not
registered it is in law not cast. Until the use of voting
machines it never was questioned that the acts of voting
and of canvassing the vote were entirely separate. When the
voter deposited his ballot legally prepared in the box, the
exercise of his right was complete. As shown by the cases
cited, the question was what candidate had received the
greater number of votes so cast by the electors, the canvass
or return of the vote being only *prima facie* evidence. That
canvass might be false, or ballots might have been lost or
destroyed during the canvass so as to make an accurate can-
vass impossible. Doubtless, any of these things placed serious
obstacles in the way of ascertaining what vote had actually
been cast. Nevertheless if, in despite of these obstacles, a
candidate could show by the testimony of electors that a
majority had actually cast their votes in his favor, such evi-
dence, if credited by the jury, entitled him to an award of
the office. When the elector in the use of a voting machine
complies with the prescribed regulations for its use so as to
indicate his choice for any particular office, the vote, so far as
he is concerned, is complete. The registry by the machine is
simply a substitute for the canvass of written votes. That it
failed to work properly cannot destroy the effect of the act of
the elector in the exercise of his constitutional right. If the
machine at the close of the polls, but before it could be
opened, were destroyed by accident or design, this should not
render the election nugatory. Doubtless it would make the
ascertainment of the vote cast a work of great difficulty, but
the difficulty of the inquiry would be no valid objection to

entering upon it.   A similar argument was addressed to the court in the *Pease* case, where it was urged that to permit a party to show that a greater number of illegal votes had been cast for his adversary than the majority the canvass gave him would be attended with great inconvenience and might last a number of years.   In response the court said : " It is the first time I have ever heard it urged that a party who had a conceded right should not have a remedy to enforce it, because a large consumption of time would take place before his right could be established.   If a party has a legal title to an office, it surely can be no legal reason for denying him the opportunity to establish it, that such process will require the examination of a large number of witnesses and consume much time in the proceeding.   Rights of parties cannot be determined on such a basis."   (P. 61.)   If the use of voting machines were attended or may be attended with the result attributed to it by the Appellate Division, I should very much doubt whether such use was constitutional, despite the amendment in 1895.   The right of the elector to vote is conferred by the Constitution, and whenever he exercises that right in conformity with the methods prescribed by law he is entitled to see that his vote has been given full force and effect in the determination of what persons have been elected to office. True, he may be unable, either by negligence on his own part or by personal misfortune, to exercise that right, but any method of holding an election which would deprive the electors free from fault or personal misfortune of the right of casting their ballots and having effect given to the votes so cast would plainly be unconstitutional.   (*People ex rel. Bradley* v. *Shaw*, 133 N. Y. 493 ;   *People ex rel. Goring* v. *President, etc., of Wappingers Falls*, 144 N. Y. 616.)   When the constitutional convention authorized the employment of methods of voting otherwise than by a ballot it never contemplated or sanctioned a method that would impair the rights which the voter  had  enjoyed  under  the  previous constitutions.   As already said, we think that the use of voting machines does not necessarily impair those rights.   It may make it more

1909.] People ex rel. Deister *v.* Wintermute. 109

N. Y. Rep.] Opinion of the Court, per Cullen, Ch. J..

difficult to ascertain the true vote cast where the machine works defectively than in cases where the paper ballots are used and the ballots are preserved. It is to be borne in mind, however, that until a few years ago the paper ballots were always destroyed immediately after the canvass, and it would not seem more difficult to establish the vote of an election district cast by a machine than when the ballots were destroyed immediately after the canvass. We are of opinion, therefore, that if the testimony of these witnesses was credited by the jury their acts at the polling place were not mere attempts to vote, but complete votes for the candidates of their choice.

The case of *People ex rel. Nichols* v. *Board of County Canvassers of Onondaga* (129 N. Y. 395) is plainly distinguishable from the one before us. There the official ballots furnished at certain election districts were improperly indorsed. It was held by a divided court that the votes should not have been counted. But, as pointed out by Judge O'Brien in the prevailing opinion, the mistake of the public officers in indorsing the ballots did not defeat the right of the elector to vote because, under the statute, he could still prepare and tender a proper ballot. Had the statute not reserved this right to the elector the case would have been very different, for though the legislature's power to regulate the method of voting is plenary, the method must be such as will enable an elector being without fault or personal misfortune to exercise his constitutional right. So it has been held that the fact that an imposter has been suffered to vote under an elector's name cannot deprive the elector of the right to vote when he presents himself at the polls. (*People ex rel. Borgia* v. *Doe*, 109 App. Div. 670.)

At the trial the practical operation of a voting machine showed on several tests that it worked more to the detriment of the relator than to that of the defendant for some reason which the experts explained. The evidence of the defective working of the machine was competent because the machine contradicted the statements of witnesses for the relator that

they had voted for him. Of course, the testimony of these witnesses was not conclusive, and if the machine proved on examination to be working properly and accurately, the jury might very possibly and probably would have discredited the witnesses as against the record shown by the voting machine. When the machine was shown to work improperly its record as a contradiction of the witnesses was very much diminished. But these tests or experiments before the jury were not competent for the purpose of showing any average of loss by the relator over that suffered by the defendant and to predicate thereon that the relator must have received so many more votes than the machine credited him with. This would be pure conjecture in which the jury should not be permitted to indulge. There is no pretense that the machine recorded votes not cast, but it failed to record votes cast. Therefore, the record as returned by the machine should be taken as the starting point of the inquiry, and such record can be varied only by competent, legal proof that voters did vote for either candidate to a number in excess of those registered by the machine.

The learned counsel for the defendant also contends that the use of the voting machine is unconstitutional in that it does not secure secrecy in voting and, therefore, the returns from those districts where machines were used should be thrown out and the election awarded on the canvass of the other districts. This would give the defendant a large majority. The evidence in the case tends to establish that when an elector votes a "split" ticket persons very close to the machine may at times hear a noise or "click" caused by the movements of the lever which is necessarily employed when the elector goes out of the straight party column. There is no pretense that any indication is given as to what candidate the elector has voted for, but simply that he has not voted a straight party ticket. The circumstances by which even this information can be gathered seem exceptional. Assuming, however, that the objections to the use of the machine, as violating the constitutional requirement, are substantial,

that question should be determined in a direct proceeding by mandamus or otherwise to compel the rejection of the machines and the use of the paper ballot, in which the subject can be fully investigated and the question fairly determined. It would be an extreme case that would justify the courts in disfranchising a large body of electors by holding that their votes cast in the method prescribed by statute were null and void.

It follows that the case should have been submitted to the jury and that the judgment below should be reversed and new trial granted, costs to abide the event.

Gray, J. (dissenting). I dissent from the decision advised by the chief judge and while I vote for the reversal of the judgment, it is upon the ground that the return of the board of canvassers in question was conclusive under the present election law. According to that return, the defendant was elected county treasurer of Chemung county by the greatest number of votes cast. There is no charge, nor pretense, of any fraud, or of fraudulent practices, by which that result was effected. The claim is, in substance, that, at the close of the voting, the voting machines in three out of the twenty-eight election districts of the city of Elmira, as to some candidates, had shown peculiar variations in the registration of votes and that, in subsequent tests, they appeared to work defectively in registering and in counting votes cast. It was conceded that they had not been tampered with; but because the subsequent tests, ordered by the court and made upon the trial, showed that they failed, at times, to register votes, which were attempted to be cast by operating the mechanical levers, or appliances, the relator claims the right to supplement their supposed defectiveness in operation by the testimony of witnesses as to how they did vote in those particular election districts. The testimony of a large number of witnesses was received to show that they had voted for the relator and, if competent to invalidate the official return, the evidence showed that more votes had been attempted to be

cast for him than the counting dials of the machines had registered. That the evidence of witnesses as to how they voted at an election is admissible, upon the trial of an action to determine the right to the office of the person receiving a certificate of election, has been frequently held and the rule as it has been applied in the cases is not questioned. If the witness does not object to being compelled to testify as to how he cast his ballot, the objection is not available to any one else. But, while such a rule has its proper application in cases where the inquiry is into the qualifications of the electors to cast a vote, or where fraud has been practiced and is shown to have affected the result, as in the cases of *People ex rel. Smith* v. *Pease*, (27 N. Y. 45), and of *People ex rel. Judson* v. *Thacher*, (55 N. Y. 525), I think it is hardly applicable to a case like this. If the result of an election, held wholly, or in part, by the use of voting machines, as declared by the official return, is to be questioned and a new result attempted to be reached by the reception and counting of votes of electors in court, upon a trial, upon the sole ground that, in certain election districts, machines in use appeared, upon subsequent tests, to operate defectively, then we have a serious innovation upon our elective system and one calculated to produce most unsatisfactory consequences. The amendment of our State Constitution in 1894 permitted elections to be by ballot " or by such other method as may be prescribed by law, provided that secrecy in voting be preserved." (Art. II, § 5.) In 1901, (L. 1901, ch. 530), the legislature amended the Election Law of 1896 and authorized the adoption, " for use at elections of any kind of voting machine approved by the state board of voting machine commissioners, or the use of which has been specifically authorized by law ; and thereupon such voting machine may be used at any or all elections held in such city * * * for voting, registering and counting votes cast at such elections " (Section 163). Sections 160, 161 and 162 provide for a board of voting machine commissioners ; for their examination of voting machines ; for the adoption thereof upon a report that they can safely be used by

voters at elections, and for the requirements, which such machines must meet, in a construction permitting of a person's voting straight or "split" tickets, or in blank columns, and which prohibits, through a lock, or locks, any movement of the mechanism after the polls are closed. Section 162 prescribes that the machine "must permit voting in absolute secrecy." The municipal authorities followed the law and there is neither question of the legality of the election held in the municipal election districts through the use of voting machines, nor question of the absolute integrity of action of the election officers, through whom the results passed and were certified.

We have, therefore, a case of the lawful adoption by the community of voting machines for the use of voters; where an approved mechanism is availed of to secure honesty, secrecy and exactness in the casting, counting and return of votes cast. It must be clear that, in the use of these machines, certain effects are understood and certain results intended, namely: that, from their construction, a vote is not registered, unless the counting dials are moved; that whether the elector has voted depends upon that fact, inasmuch as the law requires, only, of the inspectors in canvassing that they shall return "the results as shown by the counter numbers", (section 178), and that, if an elector has attempted to vote, and, for any reason, his vote is not registered by the counting dial within the machine, he has not, in fact, voted. It must be borne in mind that we are dealing with a new system of voting, authorized by law, in which security against the frauds, or frailties, of mankind is aimed at and which seems to be nearly reached, as a fact. If they are to be considered as objectionable devices in the holding of elections, that consideration is for the legislature and not for the courts to act upon. I most seriously doubt the correctness of the statement that, under the novel method of voting authorized by the Constitution and the law, greater secrecy is not aimed at. I think it to be quite apparent that the legislature must have intended to secure the more absolute secrecy of action in voting, which the mechanical

8

device offered.   As the question presents itself to my mind, in holding that the official return of the canvassers should be accepted as conclusive, we simply follow the legislative intent. They are to take what they find recorded and counted upon the counting dials, when opened at the close of the polls. What the electors, who have entered the machine inclosure, have voted is a question to be determined by the results shown upon the dial plates.   That votes of electors were not counted upon them may, it is true, have been due to machine defects; but, equally, it is true that it may have been due to the elector's mistake, or ignorance, or to his voluntary act.   It does not follow that the electors, who testified upon the trial, had attempted to vote for the relator.   Influences, or motives, may have determined them to abstain from voting for him, to which they allowed effect in the secrecy of the closet. At any rate, to require them, upon a complaint of the defective working of the machine, to testify what they intended to do, when the question is what they did, seems a dangerous precedent in cases free from fraud, or fraudulent practices.   It seems to me to be equally immaterial, whether the failure of a voter to have his vote registered be due to a defective machine, or to a defective ballot.   Under the system of voting by ballot, it may happen that the votes, which electors have attempted to cast, may not be counted, not because of any fraud, but by reason of their own mistakes, or of some defect in the ballots prepared for the election districts.   In such a case, they are deprived of their share in the election; but for that there is no remedy.   Upon the exercise of the elective franchise are imposed many conditions, which must be met before the elector's vote can be cast, or counted. Sacred as is the right of the citizen to vote, it is, under our system, not untrammelled.   In *People ex rel. Nichols* v. *Board of County Canvassers of Onondaga* (129 N. Y. 395), the wrong indorsement of the Republican ballots in certain election districts resulted in their rejection, because they were marked, or defective, ballots, and failed to meet the requirement for the secrecy of the elector's vote under the provisions

1909.] People ex rel. Deister *v.* Wintermute. **115**

N. Y. Rep.] Dissenting opinion, per Gray, J.

of the Ballot Reform Act. It was said in the opinion, if the law required the exclusion of the ballots, " that although it may deprive a portion of the citizens of the county of their right to be heard in the election of a clerk at one election, it is better that they should suffer this temporary privation than that the courts should habituate themselves to disregard or ignore the plain law of the land in order to provide for hard cases." (P. 412.) So in this case, where the method substituted for human agencies in the preparation, reception and counting of ballots was a mechanical instrument, contrived and adapted for those purposes, and the command of the statute is that the inspectors return the " result as shown by the counter numbers", the courts should give effect to the law and, there having been no fraud, should hold the return conclusive. They should not, because in instances, for some reason, as attributable to the elector's act, as to the defective working of the mechanism, disregard the official return and, on testimony of intentions, reverse the result. The elector, when asked as a witness to state, in open court, how he had intended, or attempted, to vote, may be influenced, then, by a desire to represent his personal, or political, convictions as to the relator's candidacy quite differently, than they were felt in the retirement of the voting booth. There is room for the admission of an elector's testimony with respect to how he voted or attempted to vote, at an election, in the investigation of his qualifications as an elector, or of any practices complained of on the part of the election officers ; but that it should be admissible to change the result without any such facts of complaint, I do not believe. To say that the right to an elective office ought to depend upon the number of votes cast by the qualified electors may be true ; but that does not meet the question in this case. That question is who, according to the arrangements, which the Constitution and the laws have provided for determining that question, received the greatest number of votes and was, therefore, elected to the office. The legislature has not left it an open question to be settled in the courts, at the instance of a defeated candidate, not complaining of any

fraud, but only of the result; it has prescribed a method for determining the result, which, if availed of, minimizes the uncertainties of elections and mechanically declares a result.

In my opinion, the result as declared should be conclusive. I, therefore, vote for the reversal of the judgment appealed from and I advise that a judgment in favor of the defendant be entered upon the case as made at the trial, upon the ground that the defendant was legally elected as county treasurer for the county of Chemung, for the term of three years, commencing on January 1st, 1907.

Haight, Vann and Willard Bartlett, JJ., concur with Cullen, Ch. J.; Edward T. Bartlett and Chase, JJ., concur with Gray, J.

Judgment reversed, etc.