State Senator Mary HELM, Petitioner,

v.

The STATE ELECTION BOARD of the State of Oklahoma and the Honorable Lee Slater, Secretary of the State Election Board, Respondents.

No. 53014.

Supreme Court of Oklahoma.

Jan. 3, 1979.

As Amended Jan. 8, 1979.

Rehearing Denied Jan. 12, 1979.

Stephen Jones, Enid, for petitioner.

William P. Bleakley and Eric Groves, Jernigan, Groves, Bleakley & Moorman, Oklahoma City, for intervenor, Cain.

SIMMS, Justice:

Petitioner, State Senator Mary Helm, was a candidate for election in the November 7, 1978, general election for the office of State Senator, Senate District No. 46, Oklahoma County, Oklahoma. Helm was opposed in the election by Intervenor, Bernest Cain. A dispute exists over the votes cast on an improperly programmed voting machine in Ward 6, Precinct 5, of Oklahoma City.

Helm asks this Court to assume Original Jurisdiction and prohibit the issuance of a certificate of election to Cain by the State Election Board for the reason that it is impossible to determine with "mathematical certainty" that Cain was the winner of the election.

We assume Original Jurisdiction under the provisions of Article VII, Section 4, Oklahoma Constitution, and by reason of *Edmondson v. State, ex rel., Phelps,* Okl., 533 P.2d 604 (1974); *Baggett v. State Election Board,* Okl., 501 P.2d 817 (1972), and *Williamson v. State Election Board,* Okl., 431 P.2d 352 (1967).

After the senatorial election was contested by Helm, Judge Tom Cornish of the Court of Criminal Appeals was appointed by the Chief Justice of this Court to hear and determine the contest. Neither party objected to the appointment of Judge Cornish.

The matter was heard below on both stipulations of fact and oral testimony from expert witnesses.

Avoidance of inaccuracy mandates that we hereinafter set forth the germane portions of the written stipulation as set forth here:

"4. An irregularity was made in Ward 6, Pct. 5, in machine No. 125917 concerning the arrangement of names on the ballot. The names of the candidates for State Senate on this machine were out of order in that the individual lever designated Mary Helm actually cast a vote for her opponent Bernest Cain because Senator Helm's name was on the top position of the ballot and Mr. Cain's name was directly beneath hers, whereas on the back of the machine where the votes were actually registered mechanically Senator Helm's name was below that of Mr. Cain's.

"5. Party lever labels initially on machine 125917 designated the candidate for the opposing party; that is, the party lever label designated 'Republican' was across from the label indicating the Democratic candidate, Bernest Cain, and vice-versa.

"6. After the election had been in progress some time, the straight party labels were reversed by the Precinct Election Judge.

To put it another way, the Court finds that during the first panel configuration, if any individual voter cast a straight Republican vote, the effect was that he voted for Senator Helm, and if a voter cast a straight Democratic ticket the effect was that he voted for Bernest Cain; if a voter pulled an individual lever for Mary Helm, he actually voted for Bernest Cain, or if he pulled the individual lever for Bernest Cain, he actually voted for Senator Mary Helm.

"7. After the adjustment had been made which is set forth in stipulation No. 6, the result was that if a voter voted straight Republican he in effect voted for Bernest Cain for State Senate, and if he voted the straight Democratic ticket, he cast a vote for Senator Mary Helm.

"8. The machine was shut down at 5:30 P.M. on order of the County Election Board at at that time or soon thereafter, the vote was taken off the machine which showed that on machine 125917, 78 votes were cast for Senator Mary Helm, 107 votes for Bernest Cain, and 15 votes for Nelson Berry, the Indiependent candidate.

"9. The Oklahoma County Election Board certified this machine's results in its figures to the State Election Board for the purpose of certifying the winner in State Senate District 46. On the face of the return submitted to the State Election Board, there were 5,290 votes cast for Mr. Cain, 5,084 votes cast for Senator Mary Helm, and 283 votes cast for Nelson Berry or a difference of 206 votes for Cain over Helm. However, these totals included all of the votes cast on machine 125917. If the votes cast on this machine are excluded from the totals, the result would be 5,183 votes for Mr. Cain, 5,006 votes for Senator Helm, and 283 votes for Nelson Berry. At that point, the number of votes separating the leading candidates would be less than the number of votes in dispute, i. e., there are 177 votes separating the two major candidates and 185 votes in dispute."

In other words, petitioner contends that on the machine in question, there were 185 improperly registered or counted votes which exceeds the 177 vote differential as between she and Intervenor Cain. Therefore, she concludes she has met her burden of proving that it is impossible to determine with mathematical certainty whether she or Cain is entitled to be issued a certificate of election. 26 O.S.1974 Supp., § 8-120.

■ Expert witnesses in the field of mathematics and statistical analysis were called to give an opinion as to the establishment of "mathematical certainty" by both Helm and Cain. Close scrutiny of the testimony given by the expert witnesses shows it was predicated on statistical analysis, election behavior, and mathematical probabilities. Although mathematical probabilities may be an acceptable criteria for as-

certaining the outcome of an election in some jurisdictions, it certainly is not the test to be applied in Oklahoma. Section 8-120, supra, demands "mathematical certainty." This Court in Williamson, supra, held:

"Having determined that it is not possible under the record before us to determine with mathematical certainty which candidate received the majority of the votes cast in the Senatorial Election under consideration, . . . Williamson's application for Writ of Mandamus directing the State Election Board to certify him as being the duly elected candidate to the office of State Senator, Senatorial District No. 36, Tulsa County, and to issue him a Certificate of Election, is accordingly denied."

The Williamson rule of mathematical certainty was followed in Baggett, supra; and Edmondson, supra. Further analysis of Williamson shows that this Court drew a clear distinction between "mathematical certainty" and "probability" when we stated at page 358:

"We have examined the entire returns as reflected by the 'Findings' and 'Transcript of the Proceedings of the Tulsa County Election Board', and have analyzed the votes received by all the candidates on machine 'A' and can only conclude that it is highly probable that Williamson received the majority of all the votes cast in the Senate race, which includes the 94 'unaccounted for' votes."

Here, like in Williamson, it is "highly probable" that Cain received sufficient votes on the incorrectly programmed machine in Ward 6, Pct. 5, to have won the election. But, mere probability alone, no matter how great, is insufficient to declare either party the winner of a contested election in this State.

■ We acknowledge that it is proper to call expert witnesses to testify as to their opinions on varied subjects. However, we emphatically reject the notion that it is proper in this jurisdiction, under the mathematical certainty rule, to use an expert witness for the purpose of voicing an opin-

ion as to who received the greater number of votes in an election when the expert's opinion is predicated upon a correlation between the questioned machine or ballot box and the actual known results on other machines or in other ballot boxes. Nor should an expert witness be permitted to testify as to his opinion based upon any method of "sampling", nor should he be permitted to voice any opinion as to the outcome of any election based upon "election behavior".

■ The term "mathematical certainty" as used in the cited cases and statute, is ascertainable only by mathematical computation. In other words, if by use of simple arithmetic, person "A" receives more votes than person "B", it is mathematically certain that person "A" won the election. If, however, the number of so-called disputed votes exceeds the numerical margin by which one candidate is shown to have won over the other candidate, exclusive of the disputed votes, then *mathematical uncertainty* is shown to exist.

■ Here, the "disputed" votes totalled 185. The numerical margin of Cain over Helm is 177. We conclude that Helm has established the burden of proof she assumed under 26 O.S.1974 Supp., § 8–120, supra.

Going forward with the evidence, Intervenor Cain sought to establish that he had achieved victory by a mathematical certainty by offering the testimony of ten legally registered voters to show that they had factually voted on the questioned machine, and that they had cast their vote for Cain. Petitioner and Intervenor entered into the following stipulation of record:

"BY MR. GROVES: (At the bench) The following is an offer to stipulate to the testimony of ten witnesses, each of whom are present in the courtroom under the subpoenae of the contestee, Bernest Cain.

"Each of the witnesses whose names I am going to read would testify as to their name, their address, their age, the fact that they reside in the Senate District in which the controversy takes place; that they are registered to vote, that they went to the polling place at Gatewood School in the District on November 7, 1978, that their names appeared as registered voters on the poll books kept at the polling place, and that they were in fact registered.

"That each signed his or her name next to the place where it appeared on the poll book, that they entered one of two voting machines at the polling place. Each will testify that the machine entered was the machine fartherest from the table with the poll book on the west side of the hall, not the machine next to the table with the poll book and the machine on the left side of the hall if entering through the south door of the school. .

"Each would further testify that they did cast their votes on the machine just described. Each witness would testify that he or she voluntarily waives their privilege against disclosing the tenor of their vote a (sic) political election, and each would testify that upon voting they voted for Bernest Cain.

\* \* \* \* \* \*

"The second part of the offer of stipulation is that we offer to stipulate that the machine described by each of the above witnesses as being fartherest from the table with the poll book and on the west side of the hall and on the left side of the hall if entering through the south door is in fact machine number 125917.

"BY MR. JONES: Without admitting the relevance or competency of such testimony and without waiving our objections to the introduction of the testimony, we do agree that if such ten persons called by Mr. Groves were to testify, that they would testify as Mr. Groves has indicated."

If the evidence pursuant to the stipulation is legally competent and admissible, and conceding that Helm received all but 10 of the 185 votes cast on the questioned machine, then Cain should be declared the winner by mathematical certainty, i. e., Cain 5,193, Helm 5,181. However, the trial judge sustained Helm's objection to the relevancy and competency of the stipulation as

to the testimony of the ten voters, which places in issue a matter of first impression in Oklahoma.

Where properly registered voters exercise their right to vote and take all necessary steps to vote but, through no fault of their own, a malfunction on the voting machine prevents accurate computation of their votes, may the voters testify as to how they voted?

Resolution of this precedential question cannot readily be determined through the application of Oklahoma's existing case-law, nor is any cited statute controlling of this issue.

■ It is a matter of common knowledge that the method employed to cast and count votes in Oklahoma County is unique in this State. Seventy-five of the State's Counties use paper ballots. Tulsa County, the seventy-sixth county, uses a system whereby a paper ballot is marked by the voter and inserted into an electronic machine which tabulates the ballots, but preserves the actual ballot upon which the vote is cast.

■ For those counties which employ paper ballots, the legislature by enacting 26 O.S.Supp.1978, § 7–127 [1] has clearly established the rules which govern the counting

and recounting of votes. Section 7–127(8) provides that any ballot or part of a ballot on which it is impossible to determine the voter's choice of candidate shall be void as to the candidate or candidates thereby affected. But § 7–127 is clearly directed toward the paper ballot and to apply sub-division 8 thereof to the Oklahoma County voting machines would elasticize the statute far beyond its original intendment.

A legislative void exists when a malfunctioning or improperly programmed voting machine is involved.

■ There can be no doubt that where paper ballots are concerned, the testimony of voters as to how they voted is not competent. This is so because, first, if it is impossible to determine the voters intention from the face of the ballot, it is void by statute (26 O.S.Supp.1978, § 7–127), and, secondly, if there exists a paper ballot upon which a voter has expressed a clear preference, the paper ballot is the best, primary, and controlling evidence; even over a canvass thereof, and the voter would still not be a competent witness to testify. See: *Logan v. Young,* 121 Okl. 203, 249 P. 369 (1926).

This brings us to the question of what is the "ballot" on an Oklahoma County voting

1. "§ 7–127 Rules governing counting.—

The following rules shall govern the counting and recounting of votes:

1. Any ballot bearing any mark as a distinguishing mark shall not be counted for any office or question thereon.

2. If the name of any person is written on a ballot, said ballot shall not be counted for any office or question thereon.

3. An 'X', cross, or two lines that meet, including the so-called 'check mark,' the intersection or point of meeting of which shall be within or on the line of the proper circle or square, shall be valid. Such marking shall be hereinafter referred to as 'valid markings.' Such valid markings located otherwise on the ballot shall not be counted. Such 'valid markings' shall include a circle or square which has been blackened in ink, even if the entire circle or square is not filled and even if the blackened portion may extend beyond the boundaries of the circle or square.

4. Marks used to designate the intention of the voter, other than those herein defined as 'valid markings,' shall not be counted.

5. Valid markings shall be counted even though one or both lines thereof shall be dupli-

cated, provided that the lines intersect or meet within or on the line of the proper circle or square.

6. Failure to properly mark a ballot as to one or more candidates or questions shall not of itself invalidate the entire ballot if the same has been properly marked as to other candidates or questions, unless such improper marking shall constitute a distinguishing mark.

7. A valid marking marked in the circle under the emblem of a political party shall be counted as a vote for each of said political party's candidates on that ballot, except that a valid marking marked in the square beside a candidate's name shall take precedence, for that office, over a valid marking in the circle under the emblem of a political party. Provided, further, that if valid markings are marked in the circles under the emblems of more than one political party on a ballot, said ballot shall not be counted for any offices thereon.

8. Any ballot or part of a ballot on which it is impossible to determine the voter's choice of candidate shall be void as to the candidate or candidates thereby affected."

machine, and particularly on the machine in question.

We believe the answer may be found in *Porter v. Oklahoma City,* Okl., 446 P.2d 384, 391 (1968) wherein this Court held:

"The plaintiff's argument is, in substance, that in the circumstances, the 'ballot' consists of (a) the ballot labels on the front face of the voting machines and (b) the tally sheets in the machines with the respective total votes imprinted thereon; and that the printing error on the tally sheets combined with the correction thereof by the employee or employees of the county election board mutilated all of such 'ballots' and invalidated the entire election.

"We cannot agree with the plaintiff that the tally sheets used in the voting machines of the type used at the election in question herein is a part of the 'ballot'. Under the principles upon which we decided the plaintiff's first proposition, *a 'ballot' is a means, or instrumentality, by which a voter secretly indicates his will or choice* so that it may be recorded as being in favor of a certain candidate, or for or against a certain proposition or measure. Also, see *Board of Education of Oklahoma City et al. v. Woodworth et al.* (1923), 89 Okl. 192, 214 P. 1077. As we see it, the portions of the voting machines which count the number of votes as indicated by all of the voters and imprint the various totals on a tally sheet simply take the place of the human counters used under the general statutes relating to elections when voting machines are not used at an election."

■ Under the *Porter* rationale, the conclusion is inescapable that the face of the voting machine with ballot labels bearing candidates names showing thereon is a "ballot".

The reasoning in *Porter, supra,* is reinforced by 26 O.S.1974 Supp., § 9–101, et seq. For example, § 9–108 provides: "The order of candidates' names shall be determined in the same manner as provided for paper ballots." Section 9–109 reads: "Separate portions of the panel on each voting machine shall be allocated as separate ballots."

Having determined that the face of the machine itself is the "ballot", it follows there is absolutely no method of ascertaining the intent of the voter upon a voting machine in Oklahoma County when the integrity of the canvass of votes has been destroyed, for there exists no "ballot" upon which the voters preference is indicated.

■ There is but one evidentiary source from which one may ascertain the intent of a legally qualified voter who has cast his ballot on an improperly programmed voting machine used in Oklahoma County. That source is the voter himself. The relevance of his testimony then is obvious.

We must then determine the competency of the voter to testify under the circumstances of this case which we have hereinabove described as unique. In addressing this question, we are not unmindful of *Martin v. McGarr,* 27 Okl. 653, 117 P. 323 (1911), where we held that a voter, otherwise qualified, who was denied the right of actually casting his ballot, was not permitted to testify for whom the ballot would have been cast had the voter been permitted to vote. In *Martin, supra,* no ballot existed, nor was a vote actually cast. *Martin, supra,* cites *Pennington v. Hare,* 60 Minn. 146, 62 N.W. 116 (1895) which involved twelve voters who were erroneously refused permission to vote. The *Pennington* court held it contrary to sound public policy to permit a voter to testify to what he *would* have done if permitted to vote.

We have no quarrel with the rule enunciated in *Martin* and *Pennington,* but the cases are clearly distinguishable from the matter before us. Here, we are dealing with legally qualified voters who did vote and actually believed they were casting their vote by indicating their choice of candidate on the face of the machine or the "ballot."

Our attention has been directed to *Looney v. County Election Board,* 145 Okl. 25, 291 P. 554 (1930). There, the paper ballots cast in a primary election were either mutilated, otherwise destroyed, or forged after

reaching the custody of the County Election Board. In a recount, this Court refused one of the parties permission to call certain voters to testify as to how they voted in the election. The Court, in rejecting the testimony, held that absent a showing that the ballots had been preserved according to law, the official returns prepared by the precinct officials were *prima facie* evidence of the correctness of the precinct vote and the results were conclusive in the absence of a verified petition challenging the correctness of the announced and posted results. See, also: *Turlington v. Summers,* 162 Okl. 13, 18 P.2d 865. *Looney, supra,* is distinguishable from the matter at bar, for here, the correctness of the posted results has been impeached.

■■■ Suggestion has been made the canvass of returns as shown by the improperly programmed machine should be disregarded or the entire 185 votes invalidated. We do not agree with this solution to this controversy. *In re Creedon,* 264 N.Y. 40, 189 N.E. 773 (1934) holds that a vote lawfully cast is not void, even though by reason of a mechanical defect in the voting machine it has not been correctly registered. That has occurred in this case. As said in *Creedon, supra:*

"The circumstance that at the same time a vote was automatically registered for another candidate creates a problem as to how the votes lawfully cast may be counted. It has no other effect. Where proof is presented that a vote has been cast for a particular candidate, that vote must be counted in favor of the candidate, even though it has not been properly registered on the voting machine. The wholesale elimination of all the votes cast for Walsh and Thomas might result in the election of a candidate by less than a plurality of all the votes lawfully cast."

See, also: *In re Pettit,* 246 App.Div. 895, 285 N.Y.S. 962 (1936).

The statutes of Oklahoma confer upon the judiciary only the power to disenfranchise a voter if the ballot is *void* as defined by statute, 26 O.S.Supp.1978, § 7–127, supra.

We are herein addressing an ambiguity in the canvass of return, not the issue of void ballots. To declare that a judicial officer could invalidate a vote which in all respects is lawfully cast would be to deprive electors of their constitutional right of ballot be disenfranchising them. This we do not have the authority to do, nor should we.

In *Cobb v. Berry,* 67 Okl. 29, 168 P. 46 (1917), this Court held in syllabus three:

"When the returns of the vote of a precinct are not such as to constitute *prima facie* evidence, and the ballots have been tampered with so that a recount cannot be had and the correct vote determined thereby, resort may be had to secondary evidence to determine the vote of the precinct."

In *Cobb, supra,* this Court approved the receipt of oral testimony of precinct officials. Accord: *Kent, et al. v. School Dist. No. 28,* 106 Okl. 30, 233 P. 431 (1925).

■■■ Under the authority of *Cobb* and *Kent,* we conclude that where the canvass of returns has been impeached so that they are no longer valid as in the case at bar, and where there exists no ballot from which voter intent may be ascertained, evidence in parol is admissible.

■■■ We must next address the issue of whether or not, under the peculiar circumstances of this case, the parol evidence rule of *Kent* and *Cobb* extends to the voter himself.

The general rule is set forth in 29 C.J.S. § 281:

"The policy of the law is to protect legal voters in the secrecy of the ballot. However, the public policy which protects the secrecy of the voter's ballot may yield to the greater public policy to have in office those properly and legally elected. It is only in extraordinary cases that resort may be had to the testimony of voters as to how they cast their ballots."

"By the weight of authority the exemption from obligation to disclose the character of his vote can be claimed only by the voter himself, and, if he sees fit to

answer the question, there can be no objection to the testimony;—"

The Supreme Court of Wisconsin in *Kaufman v. LaCrosse City Board of Canvassers,* 8 Wis.2d 182, 98 N.W.2d 422 (1959) held that after an election is over, a voter may waive his right to secrecy and reveal how he voted; that the privilege of a voter against testifying as to how he voted is personal in nature and the voter may testify under some circumstances.

In 1937, in *Torkelson v. Byrne,* 68 N.D. 13, 276 N.W. 134, 138 (1937), the Supreme Court of that state wrote:

"The contestant Torkelson insists that a voter should not be permitted to testify as to the person for whom he has voted at an election. Contestant contends that the constitutional provision that 'All elections by the people shall be by secret ballot' (section 129, N.D.Const.) was not simply intended as a security to the elector for the free and independent exercise of the right of suffrage, but that from considerations of public policy it should be held to prevent the voter, under any circumstances, from disclosing before a judicial tribunal how he voted. But this point was overruled by the district court. This court affirms that ruling on the ground that while a voter has the privilege of preserving the secrecy of his ballot by refusing to testify as to its contents, he is at liberty to waive that privilege. While it is axiomatic that a qualified elector cannot be compelled to disclose for whom he voted, it is also true that this privilege of secrecy is entirely a personal one, and a voter himself may waive his privilege and testify for whom he voted."

Accord: *Wehrung v. Ideal School Dist. No. 10,* N.D., 78 N.W.2d 68 (1956); *McRobbie v. Registrars of Voters of Ipswich,* 322 Mass. 530, 78 N.E.2d 498; *Handy v. Holman,* Tex. Civ.App., 281 S.W.2d 356; *Ex parte Henry,* 132 Tex. 575, 126 S.W.2d 1, followed in *Ex parte O'Brien,* 132 Tex. 579, 126 S.W.2d 3; *Ex parte McAfee,* 132 Tex. 579, 126 S.W.2d 3, and *Ex parte Kincaid,* 132 Tex. 580, 126 S.W.2d 3.

The question of a lawful voter testifying as to how he voted on a malfunctioning voter machine was first addressed in the early case of *People v. Wintermute,* 194 N.Y. 99, 86 N.E. 818 (1909). Objection was made to the testimony of electors as to how they voted upon a machine which failed to record votes that were cast. The argument was made that to permit the testimony would violate secrecy of the ballot. *Wintermute* held the testimony of the voters to be admissible saying:

"When the elector in the use of a voting machine complies with the prescribed regulations for its use so as to indicate his choice for any particular office, the vote, so far as he is concerned, is complete. The registry by the machine is simply a substitute for the canvass of written votes. That it failed to work properly cannot destroy the effect of the act of the elector in the exercise of his constitutional right. If the machines at the close of the polls, but before it could be opened, were destroyed by accident or design, this should not render the election nugatory. Doubtless it would make the ascertainment of the vote cast a work of great difficulty, but the difficulty of the inquiry would be no valid objection to entering upon it."

"The right of the elector to vote is conferred by the Constitution, and whenever he exercises that right in conformity with the methods prescribed by law he is entitled to see that his vote is given full force and effect in the determination of what persons have been elected to office. * * When the constitutional convention authorized the employment of methods of voting otherwise than by a ballot, *it never contemplated or sanctioned a method which would impair the rights which the voter had enjoyed under the previous Constitutions.* * * * We are of the opinion therefore that, if the testimony of these witnesses was credited by the jury, their acts at the polling place were not mere attempts to vote, but complete votes for the candidates of their choice."

Petitioner would have us believe that *Wintermute* is no longer viable. She urges that the more recent case of *Hogan v. Supreme Court of New York,* 281 N.Y. 572, 24 N.E.2d 472 (1939), which appears to contradict *Wintermute,* now controls. We do not agree. *Hogan* involved a proceeding under § 330 of the Election Laws of New York. Section 330 authorizes the court to determine any questions of law or fact arising as to protested, wholly blank, or void *ballots shown on the statement of canvass* in any election district or to direct a recanvass of such ballots; and to determine any questions of law or fact arising as to the canvass of returns by a canvassing board and to direct a recanvass of the returns or the performance of duty imposed by law upon such canvassing board. The illusory conflict between *Wintermute* and *Hogan* is resolved in *Application of Ingamells,* 259 App. Div. 36, 786, 18 N.Y.S.2d 247 (1940) where it is emphasized that § 330 limits the court to summary proceedings to determine law or fact questions growing out of the canvass of returns or to direct a recanvass of returns. The restrictive aspects of § 330 did not permit the Supreme Court of New York to embark upon an evidentiary hearing by accepting affidavits or testimony of voters. However, *Ingamells* did not proscribe the voter testifying in an action to try title to the office but only in a § 330 proceeding. To put it another way, as the New York court observed, it did not have "jurisdiction" to receive the testimony of voters in a § 330 action.

Petitioner cites, and the Trial Authority relied primarily upon *Kirby v. Wood,* Ky. App., 558 S.W.2d 180 (1977) in refusing the stipulation as to the testimony of voters for whom they voted. *Kirby* was overruled in *Wood v. Kirby,* Ky., 566 S.W.2d 751 (1978). The Kentucky Court of Appeals in *Kirby I* said "Kentucky law is well settled that voters will not be permitted to testify as for whom they voted." As authority for that statement the Kentucky Court of Appeals cited *Little v. Alexander,* 258 Ky. 49, 80 S.W.2d 32 (1934). Obviously, that Court misinterpreted *Little* for the *Little* case held that "a legal voter cannot be *required*

to testify or in any way disclose how he voted,". In overruling the Court of Appeals in the *Kirby* case, the Supreme Court observed that "Kentucky has refused to require a person who has voted in a general election to disclose the name of the person for whom he voted." The High Kentucky Court further observed "neither do we know of any good reason to permit a voter to voluntarily disclose the name of the person for whom he voted in the general election." A reading of *Kirby* at 566 S.W.2d 751 discloses a strange statutory scheme in Kentucky. That state has recognized the right to require a person who votes in a primary election to disclose the name of the person for whom he voted, while on the other hand, Kentucky has refused to require a person who has voted in a general election to disclose the name of the person for whom he voted. We therefore reject the Kentucky authorities above cited as upholding petitioners argument that *under no circumstances* may a voter be called to testify for whom he has actually voted.

Neither petitioner nor intervenor cite any Oklahoma Constitutional or statutory proscriptions against a voter testifying as to how he voted in an election. An examination of our election law discloses that the only impediment imposed upon a voter in disclosing how he voted in an election is contained in 26 O.S.Supp.1974, § 16–115, which provides: "Any person who, *within the election enclosure,* discloses to any other person how he voted shall be deemed guilty of a misdemeanor." (E.A.)

Finally, Intervenor Cain suggests that with the adoption of Oklahoma's new Evidence Code (Code), 12 O.S.Supp.1978, § 2101, et seq., a voter may voluntarily disclose or testify as to how he cast his vote in an election.

The purpose of the Code is declared in § 2102: "This Code shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

A definition of relevant evidence is found in § 2401 of the Code and reads: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The section 2401 definition of "relevant evidence", is qualified by § 2403 which reads: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."

Nothing contained in § 2403 would cause the testimony of voters as to how they actually voted to be inadmissible as evidence.

■■■ It should be emphasized that § 2401 of the Code is not to be construed as in any way changing or modifying the "mathematical certainty" rule which controls in election contests, as provided by the statutes above cited.

Oklahoma's Legislature, in adopting the Code, directed specific attention to the issue of voter testimony in § 2507 by providing: "A. Every person has a privilege to refuse to disclose the tenor of his vote at a political election conducted by secret ballot. B. This privilege does not apply if the court finds that the vote was cast illegally." Waiver of the § 2507 privilege is contained in § 2511 which provides: "A person upon whom this Code confers a privilege against disclosure waives the privilege if he or his predecessor voluntarily discloses or consents to disclosure of any significant part of the privileged matter. * * *"

■■■ We do not interpret the political vote provisions of the 1978 Code as legislative intent to permit a voter to voluntarily testify under any and all circumstances. The right of the voter to voluntarily testify as to how he cast his vote is subject to limitations as hereinabove discussed.

If marked ballots exist, those ballots are the best evidence as to how the voter cast his ballot and voter testimony is impermissible. If voter intent is incapable of ascertainment, the ballot shall be void and not counted according to statute. Here, there are no preserved ballots.

If the ballot has been mutilated or destroyed, the canvass of returns would constitute *prima facie* evidence of a true determination of election results. While the presumption of correctness of the canvass of returns may be impeached by extrinsic evidence, the right of a contestant in an post-election contest to adduce parol evidence does not extend to that contestant the right to have a voter testify as to how he voted. But here, the presumption of validity of the canvass of returns has been destroyed.

On a single Oklahoma County voting machine, legally registered voters actually cast their ballot by actuating the machine, the votes registered, but there is no method of ascertaining for whom the votes were registered. But no ballot exists and the precinct tabulation is impeached because of improper programing. Under these limited circumstances, we hold the stipulated testimony of the registered voters who actually voted on the machine was admissible as evidence before the trial authority.

But in so holding, we caution that in permitting the testimony of voters as to how they voted, the "rule of reason" must prevail. This opinion is not to be construed as holding that where numerous voting machine or ballot irregularities exist, the voter should be permitted to waive his privilege and testify as to how he voted. It is only under such circumstances as exist in this case, where the voter has been disenfranchised through no fault of his own, and where the election irregularity is isolated, that the testimony of the voter can become admissible by waiver of the privilege. We do not, at this time, pass upon the effect of § 2507(B).

It is to be emphasized, that under any circumstances, voter testimony is to be allowed with the utmost caution.

In holding the testimony of the ten voters to be admissible under the circumstances of this case, it is possible to declare candidate

Cain the winner of the State Senate race by "mathematical certainty". We therefore decline to grant a writ of prohibition against the State Election Board from issuing a certificate of election to Intervenor.

APPLICATION TO ASSUME ORIGINAL JURISDICTION GRANTED. PETITION FOR WRIT OF PROHIBITION DENIED.

LAVENDER, C. J., and WILLIAMS, HODGES, BARNES, DOOLIN and HARGRAVE, JJ., concur.

OPALA and IRWIN, JJ., dissent.

OPALA, Justice, dissenting:

Were I permitted to use but my common sense in solving our problem, I would be strongly dissuaded from depriving Cain of his election certificate. He is guilty of *no* misconduct and stands before us with a "clean" margin of 177 votes against only 185 that remain "in limbo." The fruits of victory would be his if we were to accept one of his two offers: (1) to establish, based on voter trends or otherwise, the mathematical probability of receiving at least 10 of the unaccounted votes or (2) to produce 10 voters who will testify that, using the misprogrammed machine in the affected precinct, they had actually cast their vote for him.

Acting as an "ordinary prudent man" I would entertain no doubt that Cain would have gotten *at least* as many of the disputed votes as he needs for his victory. I would hence be greatly tempted to let Cain do what obviously appears to be the practical, common-sense solution.

Reacting to the problem as a man of law I find the legal barrier to accepting Cain's first offer as insuperable as does the court's opinion. There is absolutely *no* legal substitute for mathematical certainty and there exists no public policy consideration that could ever justify me in fashioning one. Nor do I feel that the mathematical certainty test can be met by parol evidence supplying votes cast and then "wiped out" by a misprogrammed machine.

Passing to Cain's alternative offer, I perceive the legal effect of a misprogrammed machine's tally more analogous to a total absence of *both* the *ballot box* and the canvass of returns therefrom, while the court appears to treat it as akin to an impeached canvass following the destruction of ballots from which voter intent could have been ascertained.

The court's analogy is untenable and its resort to *Cobb*[1] inapposite. *Cobb* gives it no comfort. There "four counters, the inspector and the clerk" were allowed to give uncontradicted testimony as to their "honest count" of a box. This count had been made *before* the box was tampered with. Here, *there was never an antecedent reliable count to be impeached.* This is so because the machine admittedly failed to produce one that would deserve even marginal legal efficacy.

This case must be regarded as identical in law to: (1) a box filled entirely with ballots from which ". . . it is impossible to determine the voter's choice . . ." and which must therefore be all held void[2] or (2) unlawful action by officials which prevents eligible voters from casting a ballot or prevents eligible votes from being counted as valid.

Either situation results in valid ballots being robbed of their legal existence or simply in *no vote being cast.*

The rule applicable where eligible votes are not cast because of official interference is that announced in *Martin v. McGarr,* 27 Okl. 653, 117 P. 323, 328. *It prohibits the use of parol evidence to take the place of inefficacious ballots.*

The *Martin* rationale is that in election contests, unlike in equity, or other judicial dispute-resolution, *courts may not consider as done that which should have been done by executive officials but did not in fact happen.* Votes are to be effectively cast at the polls or not at all. Votes not previously

1. *Cobb v. Berry,* 67 Okl. 29, 169 P. 46, 47 (1917).

2. 26 O.S.Supp.1978 § 7–127(8).

cast at the polls must not be given legal birth by courtroom testimony.[3] The dangers are all too clear.[4]

The court no doubt derives some comfort from the narrow exception it carves out which would confine admissible parol testimony to election contests over misprogrammed machines in Oklahoma County only. My commitment to maintaining ballot box integrity requires a resolve that election officials' misconduct, no matter how slight or innocent, should be deterred, where as here, it results in voters being disenfranchised or their votes *having to be initially cast* in the courtroom rather than at the polls. The right of suffrage is no less precious than any of the great freedoms of the Bill of Rights. Just as we deter police misconduct by reversing convictions for technical violations of cherished rights, so should we, with like alacrity, be vigilant to guard against any action by officialdom, high or petty, which prevents eligible votes, validly cast, from being counted. If the cost of new trials in reversed criminal cases is not too high a price for society to bear for freedom from government oppression, neither is the expense of a new election untainted by vitiating official irregularity.

3. In *Pawlowski v. Thompson,* 64 S.D. 98, 264 N.W. 723, 724 (1936) this principle is clearly verbalized thusly:

   "A voter who did not vote, though legally entitled to do so, and although he did not vote because he was unlawfully prevented, can not afterwards be permitted to testify that he would have voted for a certain person, notwithstanding that the lawful votes so excluded would, if cast as intended, have changed the result.

   "The election is to be decided by the number of legal votes actually cast, and not by ascertaining what might have been cast. The election may be held invalid because of the suppression of legal votes, but public policy forbids that, after it is known just how many votes are necessary to change the result, it should be permitted to change it upon the present statement of voters as to their past intentions."

4. ". . . Where a ballot has been marked by the elector, properly cast, and returned, we have something tangible and certain to deal with, and from it we unerringly read the intention and act of the elector. *But where, as in this case, the supposed ballots were never in existence, and we must rely upon the subse-*

I shall not yield here to the temptation of a common-sense solution. The price is too high. Citizen Cain did in fact win fair and square. He has a margin of 177 *valid votes.* But the fact remains that 185 other citizens whose votes, in my opinion, may not be counted at all, were disenfranchised because of one misprogrammed machine. The vote on that machine may not be reconstructed in court. Moreover, there are here no records from which we may determine the identity of disenfranchised voters on the ill-fated machine.

This alone should be enough reason for us to order a new election. Only in so doing can we manifest our unyielding commitment to the integrity of the ballot box.

IRWIN, Vice Chief Justice, dissenting.

It is evident that without the oral testimony, the results of the election could not be determined with mathematical certainty and Senator Mary Helms would be entitled to her writ.

Under 26 O.S.1974 Supp. § 8–120, it was necessary, inter alia, for Senator Helm to "Prove that it is impossible to determine with mathematical certainty which candi-

*quent declaration of the electors as to how they intended to and would have marked and cast their ballots, if they had voted, it would be an uncertain and dangerous experiment to attempt the task of ascertaining and giving effect to their intentions as ballots actually cast and returned.* Uncertain, because it would be simply a matter of speculation; dangerous, because it would give to such electors the power of determining the result of an election in a close contest. All that it would be necessary for them to do, in such a case, to decide the election, would be to declare that they intended to vote for a particular candidate. It would enable them to sell the office to the candidate offering the highest price for it, because they would not be called upon for their declaration until a contest arose, after the actual ballots had been counted, and the precise effect of their statement known. They could swear falsely as to their past intention, without fear of punishment, for how would it be possible to disprove their statements as to their intentions with reference to a supposed act, if perchance they had acted?" *Martin v. McGarr,* supra, at p. 328, (emphasis ours).

date is entitled * * * to be issued a Certificate of Election. * * *" This was the same standard used by this Court in *Edmondson v. State ex rel., Phelps,* Okl., 533 P.2d 604 (1974); *Baggett v. State Election Board,* Okl., 501 P.2d 817 (1972); and *Williamson v. State Election Board,* Okl., 431 P.2d 352 (1967).

In my opinion, the Legislature simply did not authorize oral testimony to be used as evidence to determine the question of mathematical certainty.

I am authorized to state that Justice Opala concurs with the views herein stated.