William H. HENDERSON, Petitioner,

v.

The Honorable John MALEY, Presiding Judge, over the Petition for Recount and Petition Alleging Irregularities, in the November 6, 1990, General Election for Office Six, Oklahoma County District Judge, Seventh Judicial District, State of Oklahoma; the Honorable Lance Ward, Secretary of the State Election Board, State of Oklahoma; the Honorable Marti L. Hayes, Election Board Secretary, Oklahoma County, State of Oklahoma; and Daniel L. Owens, Contestee of the November 6, 1990, General Election to Office Six, Oklahoma County District Judge, Seventh Judicial District, State of Oklahoma, Respondents.

No. 76639.

Supreme Court of Oklahoma.

Feb. 4, 1991.

As Corrected Feb. 8, 1991.

Rehearing Denied Feb. 25, 1991.

Janis S. Powers, Shirk, Work, Robinson & Williams, William R. Burkett, Steven L. Tolson, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, for petitioner.

Eric J. Groves, Oklahoma City, for respondent Owens.

Robert Butler, Asst. Dist. Atty., Shawnee, for respondent Hayes.

Thomas L. Spencer, Asst. Atty. Gen., Chief, Civil Div. and Dan M. Peters, Asst. Atty. Gen., State of Okl., Oklahoma City, for respondent Ward.

LAVENDER, Justice.

Petitioner, William H. Henderson, requests us to issue a writ of prohibition to Respondents, Lance Ward, Secretary of the Oklahoma State Election Board and Marti L. Hayes, Secretary of the Oklahoma County Election Board directing them not to certify the results of an election held for the office of district judge. Petitioner also requests a writ of mandamus to Respondent, the Honorable John Maley (the trial judge) directing him to conduct a recount of the votes cast in said election. Alternatively, we are asked to issue a writ of mandamus to Ward directing him to set a hearing on a petition alleging irregularities submitted by Petitioner. We assume original jurisdiction, but decline to issue the requested writs.

This case presents two central questions. 1) Whether the trial court erred in his determination ballots cast in Oklahoma County during the November 6, 1990 general election were not properly preserved so that a recount of those ballots was forbidden for the race of district judge between Petitioner and Respondent, Daniel L. Owens? Principally, this issue involves whether Oklahoma County election officials were authorized by law to secure ballots after the election in cardboard boxes "secured" by paper seals under rules promulgated by the State Election Board, even though the statutes of Oklahoma require

ballots to be retained after an election in ballot boxes secured by three locks, the keys to which are to be retained by election officials, by virtue of the fact Oklahoma County uses automatic vote counting machines in its elections. 2) Whether the trial court erred in ruling a petition alleging irregularities submitted by Petitioner to the Oklahoma County and State Election Boards was untimely? We hold the trial court did not err in determining the ballots could not be recounted because not properly preserved according to law. We also rule he correctly held the petition alleging irregularities was untimely.

## FACTS

Henderson and Owens were candidates for office six, district judge, seventh judicial district, Oklahoma County. They appeared on the Oklahoma County ballot for said office at the November 6th election. Owens was the announced winner. On November 9th Henderson timely filed a petition for recount. *See* 26 O.S.Supp.1989, § 8–109.[1] The matter was set for hearing before the trial judge so evidence could be heard to determine whether the ballots were properly preserved as prescribed by law and that they were "the identical ballots cast by the voters and that they had not been exposed to the reach of unauthorized persons, as to afford a reasonable opportunity of their having been changed or tampered with." Such findings are required before a recount may take place. 26 O.S.1981, § 8–112. Prior to commencement of the hearing the parties and the trial judge inspected a suite of rooms on the fourth floor of a building next to the Oklahoma County Courthouse wherein the Oklahoma County ballots were stored under the supervision of the Oklahoma County Election Board. After the inspection the hearing commenced. A summary of the evidence presented follows.

Oklahoma County uses a cardboard ballot, in conjunction with an electronic voting device, in its elections. After the ballot is filled in by a voter it is inserted into the device which scans it and automatically reads the choices made by the voter. The selection(s) of the voters are registered in a part of the device referred to as a data pack. Prior to any votes being cast at a precinct the voting device is tested and a zero tape is produced showing that no votes are registered on the data pack. After being inserted into and read by the scanning device the cardboard ballot drops into a locked receptacle in the bottom of the machine. *Boiled down, the electronic voting device is a scanning and counting machine which takes the place of humans in registering and counting the votes of the electorate. For all practical purposes the ballot cards filled out by voters of Oklahoma County are no different than the paper ballots used in counties that do not use the electronic counting devices, but instead rely on human counters to register election results.* The ballot in Oklahoma County is the ballot card. The ballot in counties not using the electronic counting device is the paper ballot.

After the polls close the device provides a paper print-out of the results of the ballots inserted in it during the day. The cardboard ballots in the machine receptacle are removed at the end of the day by precinct officials and placed in cardboard boxes called transfer boxes. Also placed in the boxes is a copy of the print-out of the results for the machine. A paper seal is placed on these boxes. The seal has spaces for the signatures of the precinct officials (inspector, judge and clerk) and for the county, date and precinct number. The transfer boxes are placed in an unlocked zippered carrying case, which resembles a soft suitcase or sport bag. The data pack is removed from the machine and placed in a plastic bag, which, in turn, is placed in a brown envelope. A copy of the print-out of the results accompanies the data pack and another copy is posted at the precinct.

The transfer box, in its carrying case, and the envelope containing the data pack are taken by precinct officials to the building next to the courthouse. The materials

1. Section 8–109 requires a petition contesting the correctness of the announced results of an election be filed before 5:00 p.m. Friday next following the election.

are dropped off at an unloading area on the street level which is secured by at least two deputy sheriffs when the materials start arriving until all precincts have been accounted for. Each carrying case is identified by precinct by a red tag. An employee of the election board keeps a checklist of the precincts as the ballots arrive. The checklist was not submitted into evidence.

After being unloaded the carrying cases are transferred to the fourth floor by election board employees (runners) by elevator and the data packs to the election board's computer center on the first floor. About ten runners were involved in transferring the cases. None testified.

The suite of rooms on the fourth floor consists of three rooms, one large room and two smaller ones. Until all precinct cases are accounted for the rooms are watched by election board employee(s). After the last of the precinct cases arrive the two smaller rooms are locked. One set of keys to these rooms exist which are kept in the custody of an assigned deputy sheriff. The deputy testified at the hearing he still had the keys in his possession.

Evidence was also presented the transfer boxes for precinct 057 were retrieved from the fourth floor, the paper seals were broken and the ballots were run through an electronic voting device for scanning and counting at the election board computer room. This was apparently done because the device at the precinct level had not functioned properly. The transfer of these ballots between the fourth and first floors was accomplished by the runners and/or members of the election board computer staff. Any scanning and electronic counting of the ballots at the election board is accomplished under the supervision of the election board members, the Chairman, Vice–Chairman and Secretary. Any ballots removed from the holding rooms on the fourth floor are returned when the counting is completed, although the paper seals on the transfer boxes are not replaced.

No party introduced into evidence all of the transfer boxes, nor did anyone inspect the contents thereof. However, the record contains evidence that during the inspec-tion by the parties and the trial judge at least one other broken seal was observed on one of the cardboard boxes. The explanation for this was the ballot containers are handled like luggage, stacked on top of each other by heaving motions when they are finally put to rest in one of the two small rooms and the seals may be broken during this practice. Hayes also indicated there may have been other seals broken, presumably because of the way they are handled, but there was no way to know because no one inspected all of the boxes.

Finally, evidence was presented there were some precincts where the data packs had to be replaced during the day because they did not function properly and there were numerous occasions technicians had to go out to various precincts to work on the devices and/or replace the machines or data packs. Apparently, when the machine or data pack is repaired or replaced, the ballots, if necessary to obtain a count, are removed from the device and reinserted in the machine for rescanning.

On this evidence the trial court ruled he could not determine whether the ballots had been properly preserved. He appeared to be of the view there was insufficient security provided for the safekeeping of the ballots and they were exposed to the reach of too many people so they could have been available to unauthorized persons to either change or tamper with them. He appeared to be particularly concerned with the fact the cases were unlocked. It is on this record we are asked to overturn the decision of the trial court.

## PETITION FOR RECOUNT AND THE TRIAL COURT'S DECISION

■ 26 O.S.1981, § 8–112 provides it is the exclusive and sole duty of the trial judge to determine whether the ballots have been properly preserved, whether they are the identical ballots cast by the voters and that they have not been exposed to the reach of unauthorized persons as to afford a reasonable opportunity of their having been changed or tampered with. Section 8–112 also provides, "[t]he judgment of [the trial] court upon such ques-

tions shall be final and conclusive." However, quite some time ago, in construing predecessor statutes concerning election recounts, we determined the decisions of either an election board or a district court in matters of this sort are subject to review by this Court under our superintending control of inferior judicial or agency tribunals. *Looney v. County Election Board of Seminole County,* 146 Okl. 207, 293 P. 1056, 1059 (Okla.1930). We also determined in *Looney* that statutory provisions for the preservation of ballots after an election are directory, rather than mandatory and that substantial compliance is sufficient. *Id.* 293 P. at 1061. The standard of reviewing these matters, however, is constrained and this Court will not substitute its judgment for that of the lower tribunal if that decision is supported by competent evidence which fairly supports its conclusion. *Turlington v. Summers,* 162 Okl. 13, 18 P.2d 865, 867 (Okla.1933); *Looney, supra* at Syllabus 5. In other words, even if we might have come to a different conclusion than the trial court based on the evidence presented we are not free to reach a different conclusion where there is competent evidence supporting the decision.

■■■ Much has been made in this case concerning the use of the electronic voting devices and the extent of legislative authority to the State Election Board to promulgate rules for their use during elections. It is our view *authority was given only to the extent such rules would be reasonably necessary to accommodate use of the machines in an election. Rules passed and apparently followed in Oklahoma County that were not and are not necessary to accommodate use of the machines, but appear from all the evidence here to have been passed to accommodate the convenience of election officials, are outside the grant of authority.* We will explain our position below.

26 O.S.1981, § 9–101 et seq., as amended, authorizes the use of voting machines at elections conducted by county election boards. Admittedly and obviously, when one reads these sections, with one proviso, the sections do not apply to the electronic voting devices used by Oklahoma County. They apply to what is generally referred to as the lever-type voting machine where the names of the candidates are placed directly on the machines and the voter pulls a lever to register his choice. These machines, which were formerly used in Oklahoma County, are detailed in *Helm v. State Election Board,* 589 P.2d 224 (Okla.1979).

In 1976 § 9–119 was added to the voting machine provisions. This section, we believe, contemplated devices like that used by Oklahoma County and gave the State Election Board the authority to promulgate rules for their use *which would essentially provide the same protection for the purity of the ballot and against election fraud as the machines already sanctioned by the Legislature in § 9–101 et seq.*[2] Hayes and Ward, testified at the hearing the procedures used by Oklahoma County for the involved election complied with these rules. We have been provided with excerpts from the rules in the submissions of Hayes and Ward and, additionally, have reviewed the Oklahoma State Election Board Secretary's Digest (November 1, 1988), which is the official publication of the State board's administrative rules. From our review the rules were indeed complied with. The question we must answer, however, is whether the authority granted by § 9–119 allowed the State board to promulgate rules in contravention of general legislative statutes which require ballots after an election to be secured in a certain manner. We believe the authority did not extend this far.

**2.** It is quite clear the Legislature authorized use of these machines in elections. Statutes have been promulgated specifically concerning them. For example, 26 O.S.Supp.1984, § 7–129.1 explains that a ballot with writing or other marks on it may still be counted if it is otherwise properly marked so that it may be counted by the voting device. 26 O.S.Supp.1984, § 7–129.2

further sets out a procedure for recounting a ballot that has been mutilated by an electronic voting device. This Court also noted in *Helm v. State Election Board,* 589 P.2d 224, 229 (Okla. 1979), that Tulsa County was using voting devices similar to those involved here in 1979, where an actual ballot is preserved, but the tabulation was by an electronic machine.

The general statutes of this State pertinent at least in counties that use paper ballots require the use of a ballot box *with three locks on it. See* 26 O.S.1981, §§ 3–121 and 7–107. At the opening of the polls keys to these boxes are in the possession of precinct officials. During the course of voting in an election the keys are kept by precinct officials, one key by the inspector, one by the judge and one by the clerk, [§ 7–107] and the box remains locked unless it is lawfully opened to begin counting of the ballots, which is authorized to begin at 10:00 a.m. 26 O.S.1981, § 7–125.[3] Up to this counting stage we perceive of little, if any, practical difference in the way the election machinery functions in counties with the electronic voting devices and in counties that use only paper ballots and human counters. In counties that use human counters the ballot boxes *may be opened during the day to begin the counting.* In Oklahoma County the machine itself does the counting, *but may be opened during the day to repair a malfunction in the device, which may necessitate the ballots being rescanned (i.e. counted).* This counting process (in electronic device counties which may include repair of the machine and rescanning) is subject to oversight by watchers which may be employed by candidates or political parties. *See* 26 O.S.Supp.1990, § 7–130. Thus, in both types of counties at the precinct level the ballots are subject to being removed from a locked enclosure for counting.

However, after the polls close, the system used in Oklahoma County concerning the preservation of the ballots begins to diverge from certain legislative requirements. Although we believe certain divergence is necessary to accommodate functioning of the process for use of the electronic devices as counting machines, we believe no need exists for "securing" the ballots in Oklahoma County in cardboard boxes with flimsy paper seals, a practice which clearly contravenes provisions made applicable by the Legislature in counties that do not now use the counting devices employed by Oklahoma County.

Certain general statutes exist for securing ballots after the polls have closed. They are as follows. After counting at the precinct level the ballots (and other designated materials) are required to be locked in the ballot box and returned to the county election board by the precinct inspector. 26 O.S.1981, 7–133. The Legislature clearly provided the boxes *be locked with three locks and the keys thereto be retained by the three members of the county election board when returned by the inspector.* 26 O.S.1981, § 7–135. The ballot boxes, with one exception, are not to be opened until a court order is issued for their opening or until the next election.[4] 26 O.S.1981, § 7–134. The State Election Board is also authorized to prescribe methods for the sealing of ballots so any tampering with or altering after they have been sealed can be detected. 26 O.S.1981, § 7–137.

As is obvious from the recitation of the facts here, in Oklahoma County the cardboard transfer boxes, in their unlocked zippered carrying cases, *are not locked with three locks.* Further, the paper seals used to "secure" the cardboard boxes, with their apparent tendency to break because of the way they are handled or stored by election officials, *cannot* be said to be sealed in such a manner that any tampering with the contents of the boxes would easily be detected. Quite the contrary appears to be the case. We perceive of no reason related to accommodating the functioning of the machine why the boxes are not locked as ballots in counties using only paper ballots.

No one has adequately explained, except on the basis of administrative convenience, the necessity of the rules' allowance for the transferring and keeping of the ballots in

---

**3.** When counters are not authorized for an election § 7–125 provides the precinct officials shall conduct the count. In such event the count may not begin until the polls close.

**4.** The exception, not relevant here, allows for opening of the ballot box in the event the certificate of vote or the pollbook is inadvertently left in the box. In such event the box may be opened in public view in the presence of the county election board members by the precinct inspector, who is authorized to remove these items and relock the box.

cardboard boxes that, in turn, are kept in unlocked zippered suitcases or sport bags. Further, no one has explained to us why paper seals are used to supposedly seal the cardboard boxes which the election officials themselves have indicated are subject to ripping because of the way the boxes are handled so that it is difficult, if not impossible, to determine whether the seals were damaged because of the way the boxes were handled, because someone ripped a seal to change or tamper with the ballots inside or were ripped by election officials when they retrieved the contents to rescan the ballots at the county election board offices. Although we believe it might be necessary to open the boxes to accommodate use of the machines to perform the counting function even after they have left the precincts, which in other counties would be in violation of § 7–134, this in no event explains the lack of security in contravention of the other statutes we have outlined above.

In that the ballots of some precincts have to be rescanned at the county level because the machines circulated. to the precincts may have malfunctioned there is a valid basis for opening the cases and retrieving the ballots. Otherwise, the ballots would have to be hand counted at the precinct level. This would defeat the very purpose of the machines. In other words, if a properly functioning machine cannot be brought to the ballots at the precinct location the ballots must of necessity be brought to a properly functioning machine located at the county election board offices. This, however, as noted, provides no basis for transferring and retaining the ballots in unlocked cases "secured" only by paper seals subject to ripping because of the way they are handled by election officials or their employees.[5]

A central reason for protecting the actual physical ballot after an election is because when properly preserved the ballot itself is the best, primary and controlling evidence of votes cast by the electorate. *See Helm v. State Election Board*, 589 P.2d at 229, *supra; Turlington v. Summers*, 18 P.2d at 867, *supra.* Under our law when evidence is presented to suggest a reasonable probability of tampering by unauthorized persons or the trial court determines there is reasonable doubt as to the integrity of the ballot boxes [*Turlington* at 866–867] no recount is had and the returns of the precinct officials prevail. *Andrews v. State ex rel. Eskew*, 618 P.2d 398, 401 (Okla.1980). On the evidence in this record we believe the trial court did not err in his determination as to the preservation of the ballots and, in effect, ruling there had not been substantial compliance with the law. In that the ballot cards used in Oklahoma County are practically no different than those used in counties not employing machines to perform the counting function, substantial compliance with the law is not accomplished by "securing" the ballots in the manner shown by this record. At a minimum, the ballots should be transferred and preserved in boxes equipped with three locks and constructed so as to prevent accidental opening or opening by any other reasonable means, except by unlocking the three locks. Further, the boxes should be so constructed that if opened by a means other than the locks it would be

**5.** Hayes and Ward have argued here that Owens, who as Respondent, takes an opposing position to them concerning the validity of the State Election Board rules, is collaterally estopped from so doing. They assert the *same* issue was litigated four years ago in a different election contest. In said matter Owens was the contestant who had filed a petition alleging irregularities concerning the counting of ballots at the county election board offices apparently because of a massive malfunctioning of the electronic voting devices at the precinct level. As we read their submissions in said regard the same issue *was not* litigated in this previous case concerning a different election. There the issue before the trial court was whether due to the malfunctioning of the machines at the precinct level the ballots could be counted by the county election board. The issue did not directly concern the failure of election officials to use ballot boxes with three locks on them as required by statute, rather than cardboard boxes with paper seals. As we have noted in the text, we believe authority was granted to promulgate rules allowing for the counting of ballots at the county election board because in certain situations such may be necessary when machines malfunction at the precinct level. Therefore, the argument of Hayes and Ward has no merit here.

obvious in the normal situation the box had been subject to tampering.

The trial court determined, based on the facts presented, the ballots for Oklahoma County should not be considered the best evidence of the election results because of the manner in which they were preserved. In addition to relying on evidence of failure to secure the ballot boxes with locks, he was presented with evidence the boxes were handled by numerous people for a period of time which he believed presented a reasonable opportunity for tampering with or changing the ballots inside.[6] Keeping in mind the constrained standard we review decisions concerning recount proceedings spelled out in *Turlington* and *Looney, supra* we can find no valid basis to overturn this ruling. The record supports his decision and because no reasonable basis appears as to why the ballots are not provided security as is required by statute for counties not using electronic counting devices, the returns of the precinct officials should prevail and no recount should take place on this record.[7]

■ Lending support to our determination is 26 O.S.Supp.1989, § 21–101, which authorized the Secretary of the State Election Board to implement a unitary system of election administration in Oklahoma beginning July 1, 1989, including the installation of electronic, optical scanning voting devices in all State precincts. In subsection B of the statute the Secretary is authorized to adopt procedures to accomplish the above goals which must be "consistent, insofar as practicable, with existing law...." Part of the existing law are the statutes

---

6. We realize here, as we did sixty (60) years ago in *Looney v. County Election Board of Seminole County,* 146 Okl. 207, 293 P. 1056, 1062 (1930), that members of the election board do not personally have to remain with the ballot boxes at all times. Their possession of the boxes may be constructive, as well as actual. We also recognize they have the authority to employ people, as Oklahoma County has done, to assist them in carrying out their responsibilities under our election laws. 26 O.S.1981, § 2–117 (authorization for secretary of county election board to hire personnel to perform duties of the election board). We, however, do not believe authorization to hire employees is authorization for employees so hired to be in unsupervised possession of *unlocked and unsecured* ballot boxes prior to the time the ballots are secured by the County Sheriff. *See* 26 O.S.1981, § 8–110 (the sheriff is under a duty to provide security for the ballots until 5:00 p.m. Friday next following an election or, in the event a recount petition is filed, until the boxes are delivered to the district court).

7. Hayes and Ward have presented several arguments to the effect courts will give the highest respect to administrative rules consistently followed over a period of time by the agency given authority by the Legislature to administer and execute certain statutes, here our election laws. We have no quarrel with the cases relied on. However, the doctrines espoused do not provide a valid basis for upholding the scheme of ballot preservation sanctioned by the administrative agencies here. The doctrines espoused simply do not apply where administrative interpretation is not reasonable. *Oral Roberts University v. Oklahoma Tax Commission,* 714 P.2d 1013, 1014–1015 (Okla.1986). Furthermore, an administrative agency does not have the authority to make rules which, in effect, extend their power beyond that granted by statute, [*See Boydston v. State,* 277 P.2d 138, 142 (Okla. 1954) ] or to act contrary to the statute which is the source of its authority. *See Adams v. Professional Practices Commission,* 524 P.2d 932, 934 (Okla.1974). We disagree with the view expressed in the concurring in part, dissenting in part opinion of Justice Summers to the effect *general* legislative approval of the State Election Board rules under the Oklahoma Administrative Procedures Act, 75 O.S.Supp.1987, § 250 et seq., as amended, raises an insurmountable barrier to a finding of invalidity of *those* rules *which are inconsistent with express statutory mandates concerning ballot security.* Where the Legislature has promulgated statutes specifically detailing a method to be used for preserving ballots after an election such provisions delineate the level of security deemed necessary by the Legislature to protect the integrity of those ballots. In the absence of express legislative language, we cannot find the Legislature intended to authorize the State Election Board to promulgate rules which allow for preservation of the ballots in an essentially unsecured manner for a period of time and, at best, provide substantially less security than delineated by the Legislature, without some minimal showing the rules are necessitated because machines count the ballots, rather than humans. No valid basis of necessity has been put forward by the parties, my colleague Justice Summers details none and we cannot discern one. Thus, to the extent the rules of the State Election Board allow for preservation of the ballots in an unsecured manner or provide substantially; and less security than delineated by the Legislature, the rules are unambiguously contrary to Legislative provisions and exceed the grant of legislative authority found in 26 O.S.1981, § 9–119.

detailed in this opinion which *require* ballot boxes, after an election, to be secured with three locks. Section 21–101(B), we believe, points out that *only* where it is not practicable to follow legislative provisions because of the *inherent* differences in using these types of machines, rather than humans, to register the voters choices in an election, did the Legislature authorize inconsistency with existing law regarding the preservation of ballots. On the instant record it is clear to us it would be practicable to comply with the ballot security provisions as set forth herein and there is absolutely no necessity to do otherwise.

## THE PETITION ALLEGING IRREGULARITIES WAS UNTIMELY

■ Petitioner asks us in the event we do not order a recount to rule he has a right to hearing on his petition alleging irregularities. That petition was submitted the day of the hearing. Under our law a petition challenging the correctness of the announced results of an election is required to be filed by 5:00 p.m. Friday next following the election. 26 O.S.Supp.1989, § 8–109. Petitioner's petition was not filed in this time limit. Petitioner asserts all that is required is that he have filed his recount petition and that he should be allowed to raise irregularities at the hearing which were not discovered until the hearing. We believe the argument has no merit.

We have held the right to contest an election is a statutory right and statutory time limits for bringing such contests are meant by the Legislature to be followed. *See Cooper v. Dix,* 771 P.2d 614, 616–617 (Okla.1989); *Rogers v. State Election Board of Oklahoma,* 533 P.2d 621, 622–623 (Okla.1974); *Duggan v. Bailey,* 317 P.2d 200, 202–203 (Okla.1957); *See also Coleman v. Sequoyah County Election Board,* 762 P.2d 935, 936 (Okla.1988). In *Cooper* we ruled a contestee could not file a cross-petition alleging irregularities on the day of the hearing on contestant's irregularity

petition because there was no legislative authorization for the cross-petition to be filed at such time. The situation here is analogous.

■ In the present case Petitioner raised no irregularities in his petition for recount. In the recount petition he requested only a manual recount of the actual ballot cards. No specific legislative authorization exists to raise irregularities by separate petition *after* the time limit of § 8–109 has expired merely because a recount has been requested in a timely manner. *Cooper,* thus, appears controlling here and is supported by the view the time limits set by the Legislature are generally mandatory.

Petitioner argues, however, he could not have known of irregularities until he began to hear the evidence he himself presented to the trial court concerning preservation of the ballots and, apparently, until it was determined such preservation amounted to an irregularity tainting the election result. We disagree.

In the first instance, we fail to see how preservation of the ballots *after the election* would taint an election result in isolation. As *Andrews, supra* makes clear, if the ballots have not been properly preserved such that no recount can take place this does not taint the election result. It merely means the result as reported by precinct officials will prevail.

Secondly, Petitioner, like any other candidate was in a position to determine prior to 5:00 p.m. Friday next following the election any irregularities he sought to raise in his untimely petition. He or people employed by him surely could have determined at least some of the alleged irregularities prior or to 5:00 p.m. Friday. We have not been extremely solicitous to arguments a candidate was not in a position to challenge within the proper time frame election results [*Duggan v. Bailey, supra* at 203] and no reasonable basis has been provided here for us to carve out an exception for this election.[8]

---

**8.** Petitioner "invites" us in one of his submissions to take judicial notice of the ruling of the

same trial judge in an election contest concerning another district judge race in Oklahoma

We ASSUME ORIGINAL JURISDICTION and DENY THE APPLICATION FOR WRITS OF PROHIBITION AND MANDAMUS.[9]

SIMMS and HARGRAVE, JJ., and LANE and JOHNSON, S.JJ. concur.

HODGES, V.C.J., and KAUGER and SUMMERS, JJ. concur in part; dissent in part.

OPALA, C.J., and DOOLIN, J., disqualified

LANE and JOHNSON, S.JJ. appointed in place of OPALA, C.J., and DOOLIN, J.

SUMMERS, Justice, concurring in part and dissenting in part.

The majority's analysis is correct if the ballot security question is found to be controlled by the statutes governing old fashioned paper ballots. If, however, Oklahoma County's ballot security is held controlled by the more recently adopted State Election Board Rules governing "voting devices" then a different result must be reached and a recount must be ordered.

The legislature has not seen fit to expressly impose the "metal box, three locks, with keys to each Election Board member" requirement (26 O.S.1981 § 7–133 et seq.) to the more high-tech election procedures. It has said that "voting machines shall be locked" until the next election or a court of competent jurisdiction orders otherwise. 26 O.S.1981 § 9–111. But, as the trial

court and the majority correctly point out, we are not dealing with voting machines. We are dealing with a device that electronically scans and counts votes that are marked by hand.

The legislature has authorized the State Election Board to approve "voting devices" which aren't otherwise described in the statutes, and to adopt suitable rules governing their use. 26 O.S.1981 § 9–119. That is precisely what has happened here. Section 9–119 also calls for a procedure in the use of "such devices" as "provides essentially the same protection for the purity of the ballot and against election fraud" as do voting machines. *Id.* It is clear that the legislature recognizes as permissible both voting machines and voting devices. See, e.g., § 9–120, providing for the costs of printing and supplies "incident to the use of voting machines or voting devices."

Pursuant to § 9–119 the State Election Board has adopted a set of Rules and Regulations for voting devices such as the ones used in Oklahoma County, effective September 1, 1983. The rules were officially published in 22 Okla.Gaz. No. 17, 2130 (Sept. 1, 1983). Then they were filed on December 30, 1985, in accordance with the mandatory filing requirement of 75 O.S. Supp.1984 § 251. They have been submitted for both gubernatorial and legislative approval, and received the latter as recently as April 20, 1989. The rules have the force and effect of law, 75 O.S.Supp. 1987 § 308.2,[1] and there is a presumption in favor of their legality. *Rotramel v. Public*

---

County where the trial judge found sufficient irregularities to void the election. Review of the trial judge's ruling is currently before this Court in *Jackson v. Maley, et al.,* 806 P.2d 610 (Okla.1991). We decline the invitation. To accept it would effectively emasculate the time limits set by the Legislature which have consistently been enforced by this Court. We believe if the time limits so set are too stringent it is for the Legislature to change those time limits, not this Court under the guise of judicial lawmaking.

9. In view of our rulings herein we deem the motions to strike, etc. filed by Respondent Owens on December 7 and 10, 1990, to be moot. Even considering the issues raised by Respondents, Ward and Hayes and Petitioner, sought to

be stricken by Owens, Petitioner is not entitled to the relief prayed for from this Court. We further have no occasion to reach the issue raised by Owens that the petition alleging irregularities of Henderson was insufficient under 26 O.S.Supp.1990, § 8–120, because of failure to specifically allege a sufficient number of irregularities tending to prove either Henderson was lawfully entitled to be issued a certificate of election or it was impossible to determine with mathematical certainty which candidate was so entitled.

1. 75 O.S.Supp.1987 § 308.2 B: Rules shall be valid and binding on persons they affect, and shall have the force of law unless amended or revised or unless a court of competent jurisdiction determines otherwise.

*Service Company,* 546 P.2d 1015, 1017 (Okla.1975). They provide for ballot security, but not the "metal box, three locks, etc." version. The Secretary of the State Election Board testified without contradiction that Oklahoma County's procedure of using the transfer box and sealing with paper tape in this election was in compliance with State Election Board Rules. (Tr. 102). The legislature requires no more, unless, as observed earlier, we consider ourselves bound by the original statutes on pre-electronic ballot counting.

I would allow the State Election Board's rules to control the Oklahoma County ballots and those of any other county using electronic voting devices. That done, a finding of the substantial compliance required in recount cases would follow. See *Looney v. Election Board of Seminole Co.,* 146 Okl. 207, 293 P. 1056 (1930). Since there was no evidence offered (or suggested) of ballot tampering, unauthorized persons in the sheriff's vault, or other criminal misbehavior, I would declare the ballots secure under 26 O.S.1981 § 8–112, and direct that the timely requested recount proceed.

I concur with the Court that the petition for contest alleging "irregularities" was filed out of time.

I am authorized to state that KAUGER, J. joins in these views, and that HODGES, V.C.J. joins except as to the petition for irregularities.